[Crim. No. 25277. Dec. 28, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS VICTOR HAYES, Defendant and Appellant.

COUNSEL

Ross Thomas, under appointment by the Supreme Court, for Defendant and Appellant.

Robert W. Brower as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

EAGLESON, J.—Defendant Louis Victor Hayes was convicted by jury trial of the first degree murder of Rigoberto G. (Pen. Code, § 187),[1] and the robbery (§ 211), rape (former § 261, subd. 3), and forcible oral copulation (§ 288a, subd. (c)) of the deceased victim's wife, Marie G., as well as the burglary of their residence (§ 459). Hayes was found to have personally used a firearm in the commission of each offense (§ 12022.5.) Three special circumstances were found true: that defendant committed the murder while engaged in the commission of a robbery, rape, and burglary (§ 190.2, subd. (a)(17)(i), (iii), and (vii)). Hayes was sentenced to life imprisonment without possibility of parole on the murder count and determinate terms for the related offenses.

Surviving victim Marie G. was hypnotized within hours of the crimes for the purpose of assisting a police artist in the creation of a composite sketch of the face of her unmasked assailant, and to develop more information regarding the details of the crime.

For the reasons set forth hereafter, we conclude that under the rule of *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], made retroactive in *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635], and thus applicable to this case, the erroneous

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

admission of Marie's *posthypnotic* testimony—in particular her positive identification of defendant as the unmasked assailant—requires reversal of defendant's convictions. We further hold that, on retrial, the fact that Marie underwent hypnosis will not bar her from testifying to events which the court finds she recalled and related prior to the hypnotic session.

The following is the account of the crimes furnished by Marie to investigating officers prior to her hypnosis, as memorialized in the written police reports and testimony of the investigating officers. We also briefly summarize the testimony of several other key prosecution witnesses.

## I.

Officer Ronald Reed testified that he responded to a report of a shooting in Burlingame at 4:16 a.m. on February 27, 1979. Firemen were already at the scene. He entered the apartment and found Rigoberto G. lying on his back in the front hallway, bleeding profusely from a gunshot wound to the chest. The victim died en route to the hospital.

The deceased's wife Marie was in the kitchen/living room area with her aunt and uncle, who occupied an upstairs apartment. Crying hysterically, she told Reed that two Black male adults had broken into her house, raped her, stole a ring and watch, and upon fleeing had shot her husband.

Marie described the first assailant who entered the apartment (later identified as defendant Hayes) as a Black male in his early 20's, with a "slim" build, approximately 6 feet tall, 160 to 170 pounds, black hair, brown eyes, mustache and possible goatee, wearing dark clothing and a dark, possibly black, watch cap. He was carrying a large black gun approximately four to six inches long, which she believed was a revolver.

Marie described the second assailant who entered the apartment (later identified as Jack Roundtree) as a "black male adult in his twenties, about five-foot-ten, 180 pounds, stocky build, dark clothing and had a ski mask on. He was carrying a small, silver automatic pistol approximately two inches long." In a second statement given a short time later but still prior to being hypnotized, Marie further described the second assailant's "ski mask" as "a dark watch cap, possibly black, that was pulled down over his face with two eyelets cut out and cut out by hand, they were jagged."

At 4:53 a.m., Reed took Marie to Peninsula Hospital for a rape examination. She was then advised that her husband had died en route to the hospital. At approximately 7 a.m., she was taken to the police station and separately interviewed by Officer Reed and Homicide Detective James

Eldridge over the next two hours. Reed testified that during this interview Marie related the following account of events:

She and her husband had sexual intercourse and went to bed at 9:15 p.m. She set her alarm clock for 3:30 a.m., as she had to be at work as a waitress at a Burlingame hotel at 5 a.m. She awoke and was dressing when she heard a knock at the front door. Marie glanced at the clock; it was 4 a.m. Her husband was still asleep. She unlocked the front door and opened it "a little" to look outside. Seeing no one, she started closing the door when unmasked "suspect one" appeared and pushed the door in. She described "suspect one" during this interview as a Black male in his early 20's, 6 feet tall, slim build, weighing approximately 160 to 170 pounds, with a mustache and possibly a goatee, wearing dark clothing and a dark colored watch cap, and holding a black gun 4 to 6 inches long.

As "suspect one" entered the apartment Marie yelled for her husband who awoke, sat up in bed, and asked what was going on. "Suspect one" yelled to his confederate to "come on in," whereupon "suspect two" entered the apartment. Marie described "suspect two" during the interview as a Black male, 5 feet 10 or 11 inches tall, 180 pounds, also wearing dark clothing, with a watch cap pulled over his head and eyeholes cut or ripped out around the eyes. He held this "mask" down over his face with his right hand. In his left hand he held a small, silver automatic pistol, approximately two inches long.

"Suspect one" told Marie he "wanted all the money." She replied that she did not have much, and that what she had was in a jar near the couch in the bedroom. He ordered her to get it. She complied, placing a gallon jar of coins on the cabinet next to the doorway, and returned to the bed next to her husband. Marie told Reed she "begged them not to hurt us and told them to take the money and leave us alone.

"Suspect two" then ordered her into the bathroom. She complied. The lights were on and she sat down in a corner near the shower. He closed the door and directed her to sit on the toilet. He pointed his gun at her, unzipped his pants, and ordered her to suck his erect penis, pulling her forward by her shoulder. She closed her eyes and complied.

"Suspect two" then ordered Marie to get up and take off her dress, panties and pantyhose, and forcefully raped her, achieving ejaculation. He ordered her to wipe his penis with a bath towel. She complied, thereafter wrapping the towel around herself and returning to the bedroom where her husband asked what had happened.

The two assailants then started arguing: "suspect two" wanted Marie to start unhooking the stereo, "suspect one" had other plans for her. "Suspect one" next touched her breast, then started pulling at her high school ring, which she removed from her finger and gave to him. He took her husband's wristwatch from the nightstand and placed it in his pocket. He next ordered Marie into the kitchen to get her purse. She complied. He told her he wanted only bills, not coins. She could not find any currency in her purse. He then ordered her to sit on a kitchen chair and exposed his uncircumcised penis. He placed his gun to the left side of her neck and ordered her to "[s]uck on it and it better be good." When he achieved an erection, he ordered her to stand on a chair, then changed his mind and told her to lay down on the kitchen floor. "Suspect two," who was standing in the hallway with his gun pointed in the direction of the bedroom, looked into the kitchen to see what "suspect one" was doing. "Suspect one" spread Marie's legs apart, placed the gun against her head and forcibly raped her, stating: "It better be good, better be good."

As she was being raped the second time, Marie heard "suspect two" saying, "Stay in bed, get back in bed." She heard her husband say "No," after which "suspect one" joined "suspect two" in the hallway as he was backing toward the front door. Marie came running out of the kitchen, heard a shot and her husband yell "Marie," then saw him fall to the floor. She did not see which of the two assailants had fired the shot. The two assailants ran out the front door. Marie shoved it closed and telephoned the fire department.

Officer Reed testified that during this interview on the morning of the incident, Marie told him she was certain she could identify the first assailant who entered the apartment: the taller, thinner one who wore no mask.

At trial, Homicide Detective Eldridge recounted the separate statement he took from Marie after Officer Reed had interviewed her. It was his standard practice to have the "primary investigation officer" who was first to arrive on the crime scene interview the victim or witnesses, whereafter he would reinterview them. The record reflects that Marie's statement to Detective Eldridge was virtually identical in all particulars to the statement she gave to Officer Reed.

Marie was then hypnotized within hours of the crimes for the purpose of assisting a police artist in the creation of a composite sketch of the face of her unmasked assailant, and to develop more information regarding the details of the crimes. Further details regarding the hypnotic session are set forth below.

Also on that same day Jack Roundtree was arrested for an unrelated armed robbery. At that time he was wearing a dark blue knit cap with distinctive hand-cut eyeholes. Marie was immediately shown the distinctive "cap mask" and identified it as "identical" to the one worn by her masked assailant the night before.

Although Marie was the principal prosecution witness, there was considerable additional evidence presented in the People's case-in-chief.

Vincent Todd, a childhood acquaintance of Roundtree who also knew defendant Hayes from their East Palo Alto neighborhood, testified for the prosecution. Todd had furnished the lead which first implicated defendant and Roundtree in the murder, ultimately leading to defendant's arrest. Todd gambled frequently at a local card room, was an ex-felon with convictions for receiving stolen property and burglary to his credit, and had served in the past as a police informant. Moreover, he had sought and obtained "payments" totalling between $1,500 and $2,000 for his cooperation and testimony in this case.

Todd testified that on February 26, 1979, he had consumed large quantities of beer, brandy, and Valium pills. Around midnight he took his date home, then drove alone to Mickey's Liquor Store in East Palo Alto where he encountered Roundtree, who was dressed in a dark-colored jogging suit and a "rolled up" blue ski hat. Shortly, a man called Tilley and defendant Hayes entered the liquor store. Todd did not know Tilley. He knew defendant as "Goldie," a nickname earned for his gold-capped front incisor tooth which sported a star in its center. Defendant was wearing a sport coat, sweater, and tweed hat that evening.

The men purchased some brandy and determined "to go try and make money"—"hustle any way possible." Todd drove the foursome north through Redwood City and stopped for gas. Defendant had a .357-caliber Smith and Wesson magnum revolver stuffed in his belt, which he told Todd he had stolen from a taxicab driver whom he had robbed with a broken Coke bottle. Defendant suggested, "we are going to make money with it." Tilley had a .25-caliber nickel-plated automatic. Defendant took the wheel, stating he would drive because "Todd was driving too bad with four felons in the car." Todd claimed he got in the back seat and passed out. Sometime later he awakened when they changed a flat tire. He recalled hearing defendant and Roundtree discussing a possible robbery of a motel in front of which they were parked.

Todd reawakened at approximately 5 a.m. that same morning in his car, which was stopped next to a California Highway Patrol sign along the

shoulder of the freeway. His companions were nowhere in sight. Hayes's brown tweed hat and .357 magnum were on the front seat. Todd got some gas, drove home and went to bed. The next day he read a newspaper account of the murder in Burlingame, which had occurred in the vicinity where he had awakened in his car. He contacted the Burlingame police and learned that the race of the suspects was Black.

Todd knew that defendant's .357 magnum revolver, now in his possession, contained four live rounds and one expended shell casing.[2] He sold the gun in Palo Alto that same day. He then recontacted the Burlingame police and furnished information about the foursome's activities that previous night. He later admitted lying to the police about the whereabouts of defendant's gun, telling them at that time that he (Todd) had thrown it off the Dumbarton Bridge. Todd testified that due to his ex-felon status he feared being found in possession of the murder weapon. He assumed the police would not recover the gun once it was sold. Once he turned state's evidence in this case, Todd's life was threatened in connection with both defendant's and Roundtree's prosecutions.

Dennis Jones, a Daly City cab driver, was robbed by one of two men whom he picked up and drove to East Palo Alto on the night before the instant crimes. At trial Jones positively identified defendant as the man who held a broken bottle to his throat, stole his .357 magnum revolver, and threatened to blow his brains out while searching through his clothing and the cab for money. Jones identified the .357 magnum revolver, recovered during the unrelated arrest of the man to whom Todd had sold defendant's gun, as the gun defendant stole from him during the robbery.

There was also physical evidence presented by the prosecution which circumstantially linked defendant and Roundtree to these crimes and further corroborated Marie's testimony.

The record reflects that defendant was considerably taller and slimmer than Roundtree at the time these crimes were committed. He was also uncircumcised.

A nonfiltered Camel cigarette butt was recovered into evidence from the floor of the victims' apartment by a San Mateo County Sheriff's field evidence technician who arrived at the crime scene one and one-half hours after Officer Reed. Marie testified that she smoked Salem filter-tipped cigarettes, and that the deceased smoked Marlboro filter cigarettes. A commis-

---

[2]There was no conclusive ballistics evidence establishing defendant's gun as the murder weapon. The autopsy performed on Rigoberto G. on the day of his murder did reveal that he died of a single gunshot wound to the chest, made by either a .357- or .38-caliber bullet.

sary attendant at the county jail where defendant was incarcerated one month after the incident testified and produced commissary order slips reflecting that defendant had purchased nonfiltered Camel cigarettes while in jail.

Brian Wraxall, a forensic serologist, testified that he tested the saliva residue on the Camel cigarette butt, which he determined was from a person who was a "type O" secreter. Defendant and Marie were "type O" secreters; Roundtree, the deceased victim, Todd and Tilley were not. Thirty-eight percent of the general population are "type O" secreters. Wraxall's serological results did not go unimpeached at defendant's trial. The defense called Benjamin Grunbaum, a retired biochemist, who claimed that all of Wraxall's blood, saliva and semen test results in this case were invalid.

Wraxall also tested the semen residue found on the towel with which Roundtree ordered Marie to wipe off his penis. The results showed it was from a "type B" nonsecreter. Roundtree was such a person; defendant, the deceased victim, Todd and Tilley were not. Only one out of one hundred and forty-five Black persons is a "type B" nonsecreter.

The prosecution also called one Herbert Hoover Dean, a lifelong friend of Roundtree, who was also acquainted with defendant. For a period of time Dean was housed in a county jail cell next to defendant and claimed to have talked with him about his (defendant's) case. Dean testified that defendant made certain incriminating admissions to him about the incident: that the foursome had been involved in the Burlingame crimes, that Roundtree had been armed with a .22-caliber pistol and defendant had a .357 magnum pistol, that defendant had shot the man in the home, and that Roundtree had been arrested a day or so after the incident while in possession of the distinctive "cap mask." Various other facts which Dean claimed defendant related to him were wholly inconsistent with Marie's account of the episode. Moreover, like Todd, Dean was impeached. On cross-examination he admitted wanting favorable consideration in an unrelated robbery case pending against him and wanting to make a deal with the prosecution in order to get back with his girlfriend in Texas. He also admitted several prior felony convictions.

## II.

In *People* v. *Shirley, supra*, 31 Cal.3d 18—decided three years after Marie was hypnotized during the investigation of this case—we held that "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, *from the time of the hypnotic session forward*." (*Id.*,

at pp. 66-67, italics added.) We further characterized "events in issue" as those that were "the subject of the hypnotic session." (*Id.*, at p. 68.) In *People* v. *Guerra, supra*, 37 Cal.3d 385, 390, the rule of *Shirley* was made retroactive to all cases not yet final as of the date *Shirley* was decided. This is such a case.

After furnishing her statements hours after the incident, Marie assisted Belmont police artist Frances Caine in compiling a composite drawing of her unmasked assailant. To facilitate the drawing and develop more information regarding the details of the crime, Detective Eldridge asked Lieutenant James Scales, a police hypnotist, to hypnotize Marie. Marie's session with Caine and Scales was recorded on tape, and a transcription of the recording was admitted in evidence. Scales was told that Marie was a rape victim and had witnessed a shooting; he was not given further details of the crimes. According to Marie, Lieutenant Scales succeeded in relaxing her, but she remained conscious and aware throughout the procedure and did not feel she had been placed in a hypnotic state. Scales told Marie to make any desired changes in the drawing during the hypnotic session. Marie recalled making only minor changes in the appearance of the eyes and hat in the composite drawing of the suspect.

The day following the murder, Marie tentatively selected defendant's photograph from a photographic lineup as the unmasked assailant. One week later she positively identified Hayes at a physical lineup, noting that he no longer had a mustache or goatee and had cut his hair shorter. She positively identified him again at trial.

■ Under the rule of *Shirley*, Marie's *posthypnotic* testimony, including her posthypnotic lineup and in-court identifications of Hayes, was inadmissible. The error must be deemed prejudicial if we determine it is reasonably probable that a result more favorable to the defendant would have occurred had such testimony not been admitted. (*Shirley, supra*, 31 Cal.3d at p. 70; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; accord, *People* v. *Johnson* (1988) 47 Cal.3d 576, 600-601 [253 Cal.Rptr. 710, 764 P.2d 1087].)

The Attorney General urges that we find the error harmless for several reasons: Marie "never wavered" and was "certain of her facts and her identification"; her description of "suspect one" did not change after the hypnotic session; at the time of the hypnosis neither the hypnotist nor police artist had a suspect in mind and thereby could not have implanted in Marie's mind any suggestion that defendant was a suspect; "[Marie] herself discounted the value of the hypnosis and doubted whether she had ever

been hypnotized"; and defendant has not shown he was denied effective cross-examination of Marie.

We reject these urgings under the rule of *Shirley.* Moreover, we need not belabor the point. It is indisputable that Marie had no occasion to identify Hayes until *after* she had been hypnotized. The posthypnotic identification was erroneously admitted under *Shirley,* and since this was the only direct identification of the defendant we conclude it is reasonably probable that the lone surviving victim's positive identification of him as the unmasked assailant helped secure his convictions. We therefore reverse the convictions.

## III.

The matter of the admissibility of "prehypnotic evidence" was expressly left open in *Guerra.* (37 Cal.3d at pp. 427-429.) ▮ We now hold, in accord with a nearly unanimous body of sister-state decisions (see, e.g., *Guerra, supra,* 37 Cal.3d at pp. 429-432 (conc. opn. by Kaus, J.); *Shirley, supra,* 31 Cal.3d at pp. 77-78, fn. 3 (conc. & dis. opn. by Kaus, J.)), that a witness who has undergone hypnosis is not barred from testifying to events which the court finds were recalled and related prior to the hypnotic session.

In his concurring opinion in *Guerra,* Justice Kaus succinctly summarized the argument and authorities in support of such an exception to the *Shirley-Guerra* exclusionary rule for prehypnotic evidence. His analysis is instructive:

"To the extent that the *Shirley* decision embodies the principle that testimony 'created' in [a police-conducted] hypnosis session is not sufficiently reliable to be admitted in a criminal trial, I agree that it establishes a rule that goes to the heart of the accuracy of the factfinding process and should be applied retroactively.

"But while I agree that the victim's *hypnotically created* testimony . . . was impermissibly admitted and should be excluded on retrial, I would make it clearer than the majority does that *Shirley* should not be applied retroactively to bar the victim from testifying on retrial about facts or memories that the trial court can reasonably determine were *not* created during the hypnosis session. . . .

". . . [T]he police and prosecution have been on notice since *Shirley* was filed of the consequences that flow under that decision if a potential witness is hypnotized. As a result, the *prospective* application of *Shirley*'s strict

exclusionary rule may not impose substantial, adverse effects on the administration of justice in this state. [Fn. omitted.]

"But the same cannot be said for the *retroactive* application of the decision's prophylactic sanction. We must remember that this is only one of many cases that will be affected by our determination of the appropriate remedy to apply to those witnesses who were hypnotized before *Shirley*. With respect to such cases, there is a special need to ensure that in our zeal to protect the citizenry from the hazards of hypnosis, we do not create a greater injustice by an after-the-fact disqualification of crucial witnesses who have relevant—frequently vital—information that is not tainted by the hypnosis.

"Although it may not be immediately apparent from a reading of the scholarly majority opinion, the recent out-of-state decisions which are most in tune with *Shirley* do *not* support *Shirley*'s conclusion that a witness who has been hypnotized may not testify with respect to any subject discussed in the hypnosis session. . . . [*V*]*irtually all of the other states that have adopted a 'per se' rule excluding hypnotically induced testimony, have at the same time expressly declared that a witness is not necessarily barred from testifying to events which the witness recalled and related to others before undergoing hypnosis.* (See *State* ex rel. *Collins* v. *Superior Court, etc.* (1982) 132 Ariz. 180 [644 P.2d 1266, 1295-1296]; *Com.* v. *Kater* (1983) 388 Mass. 519 [447 N.E.2d 1190, 1197-1200]; *State* v. *Patterson* (1983) 213 Neb. 686 [331 N.W.2d 500, 503-504]; *People* v. *Hughes* (1983) 59 N.Y.2d 523 [466 N.Y.S.2d 255, 453 N.E.2d 484, 495-496]; *State* v. *Collins* (1983) 296 Md. 670 [464 A.2d 1028, 1044]; *State* v. *Blanchard* (Minn. 1982) 315 N.W.2d 427, 430-431; *Strong* v. *State* (1982) __ Ind. __ [435 N.E.2d 969, 970-971]; *Robison* v. *State* (Okla.Crim.App. 1984) 677 P.2d 1080, 1085; *State* v. *Peoples* (1984) 311 N.C. 515 [319 S.E.2d 177, 188]; *Com.* v. *Taylor* (1982) 294 Pa.Super. 171 [439 A.2d 805, 808]; *People* v. *Quintanar* (Colo.App. 1982) 659 P.2d 710, 713-714.) [Fn. omitted.]

"These decisions recognize that while there are theoretical objections to even such testimony, the probable reliability and potential importance of the evidence justifies its admission. As the New York Court of Appeals explained: 'A criminal trial for rape or assault would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment. Even in cases dealing with the frailties of eyewitness identification some allowance must be made for practicalities (see, e.g., *Stovall* v. *Denno* [(1967)] 388 U.S. 293, 301-302 . . . .) [¶] When confronted with suggestive pretrial identification, it has not been found necessary to preclude the

witness from making an in-court identification on the basis of recollections prior to the suggestive procedure, if it is found as a fact that he can do so without relying on the improperly made identification . . . . A similar procedure would seem to be appropriate in cases involving the pretrial use of hypnosis. . . .' (*People* v. *Hughes, supra,* 453 N.E.2d at pp. 495-496.)

"Thus, when the scope of the recent out-of-state decisions is properly understood, it becomes clear that the numerous authorities relied on by the majority to accord retroactive application to *Shirley* do not support the proposition that a witness hypnotized before *Shirley* should be totally barred from testifying at trial. Rather, the cases suggest that such a witness should generally be permitted to testify at trial as to prehypnosis memories so long as there is satisfactory evidence from which the trial court can determine that the witness did in fact recall and relate the statements before undergoing hypnosis. (See, e.g., *State* v. *Collins, supra,* 464 A.2d 1028, 1044-1045; *People* v. *Hughes, supra,* 453 N.E.2d 484, 496; *State* v. *Patterson, supra,* 331 N.W.2d 500, 504; *People* v. *Quintanar, supra,* 659 P.2d 710, 713; *Com.* v. *Kater, supra,* 447 N.E.2d 1190, 1197-1200.)" (*People* v. *Guerra, supra,* 37 Cal.3d at pp. 429-432, italics in original (conc. opn. by Kaus, J.); see also cases cited in *Shirley, supra,* 31 Cal.3d at pp. 77-78, fn. 3 (conc. & dis. opn. by Kaus, J.).)

Our subsequent research has revealed the following additional sister-state and federal circuit court cases postdating *Shirley* and *Guerra* which, like the numerous out-of-state decisions cited by Justice Kaus in *Guerra, except* prehypnotic evidence—i.e., evidence which the hypnotized witness recalled and related prior to undergoing hypnosis—from their respective state and federal circuit rules excluding or restricting the admission of posthypnotic testimony: *Little* v. *Armontrout* (8th Cir. 1987) 819 F.2d 1425, 1435; *United States* v. *Kimberlin* (7th Cir. 1986) 805 F.2d 210, 223; *Harker* v. *State of Md.* (4th Cir. 1986) 800 F.2d 437, 441; *Sprynczynatyk* v. *General Motors Corp.* (8th Cir. 1985) 771 F.2d 1112, 1123; *Clay* v. *Vose* (1st Cir. 1985) 771 F.2d 1, 4-5; *United States* v. *Valdez* (5th Cir. 1984) 722 F.2d 1196, 1204; *Contreras* v. *State* (Alaska 1986) 718 P.2d 129, 139-140; *Bundy* v. *State* (Fla. 1985) 471 So.2d 9, 18; *State* v. *Iwakiri* (1984) 106 Idaho 618 [682 P.2d 571, 579]; *King* v. *State* (Ind. 1984) 460 N.E.2d 947, 950; *State* v. *Peoples* (1984) 311 N.C. 515 [319 S.E.2d 177, 188]; *Peterson* v. *State* (Ind. 1983) 448 N.E.2d 673, 675; *State* v. *Seager* (Iowa 1983) 341 N.W.2d 420, 431.

In accord with these authorities, we conclude that the defendant should not gain effective immunity from prosecution by a rule that would bar the previously hypnotized victim, without exception, from the witness stand. (See *Guerra, supra,* 37 Cal.3d at p. 432 (conc. opn. by Kaus, J.).) Accordingly, should the People elect to retry this case, the fact that Marie under-

went hypnosis will not bar her from testifying to events which the court finds she recalled and related prior to the hypnotic session, and any other testimony concerning subjects not discussed during her hypnotic session.[3]

Under the standard for admitting prehypnotic evidence generally adopted by the courts of our sister states which have addressed the question, a witness is permitted to testify to events that the trial court finds the witness both recalled and related to others before undergoing hypnosis. In turn, the opposing party is permitted to introduce evidence of the fact and method of the hypnosis, and its potential effects on the witness's recollection. (See, e.g., *State* ex rel. *Collins* v. *Superior Court, etc.* (1982) 132 Ariz. 180 [644 P.2d 1266, 1295-1297]; *Com.* v. *Kater* (1983) 388 Mass. 519 [447 N.E.2d 1190, 1197-1198]; *State* v. *Patterson* (1983) 213 Neb. 686 [331 N.W.2d 500, 510-505]; *People* v. *Hughes* (1983) 59 N.Y. 523 [466 N.Y.S.2d 255, 453 N.E.2d 484, 495-497]; see generally *People* v. *Guerra, supra,* 37 Cal.3d at pp. 431-432, and cases cited (conc. opn. by Kaus, J.).)

We adopt this standard as governing the admissibility in California of all prehypnotic evidence predating January 1, 1985—the effective date of Evidence Code section 795.

## IV.

■ We must also determine whether Evidence Code section 795 will apply to any *retrial* of this case. The regulatory provisions of that statute are set forth in the margin.[4]

---

[3] For example, Marie would not be barred on retrial from identifying the "cap mask" worn by "suspect two" (the masked assailant), since she described the cap in her statements prior to undergoing hypnosis, and because the appearance of that cap was not a subject discussed during the hypnotic session.

[4] Section 795 provides: "(a) The testimony of a witness is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness' testimony, if all of the following conditions are met:

"(1) The testimony is limited to those matters which the witness recalled and related prior to the hypnosis.

"(2) The substance of the prehypnotic memory was preserved in written, audiotape, or video tape form prior to the hypnosis.

"(3) The hypnosis was conducted in accordance with all of the following procedures:

"(A) A written record was made prior to hypnosis documenting the subject's description of the event, and information which was provided to the hypnotist concerning the subject matter of the hypnosis.

"(B) The subject gave informed consent to the hypnosis.

"(C) The hypnosis session, including the pre- and post-hypnosis interviews, was video tape recorded for subsequent review.

"(D) The hypnosis was performed by a licensed medical doctor, psychologist, or licensed clinical social worker experienced in the use of hypnosis or a licensed marriage, family and

A new statute is generally presumed to operate prospectively absent an express declaration of retroactivity or a clear and compelling implication that the Legislature intended otherwise. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1206-1209 [246 Cal.Rptr. 629, 753 P.2d 585].) We find nothing to overcome that presumption in this case.

The bill that enacted Evidence Code section 795 (Stats. 1984, ch. 479) contained no retroactivity clause. Nothing in the history, context, wording or purpose of the legislation suggests that the Legislature intended the new provisions to apply retroactively. The prehypnotic evidence in question here predates the statute by several years: the prehypnotic interviews with Marie occurred on February 27, 1979, while section 795 took effect on January 1, 1985. It would be manifestly unfair to apply the regulatory provisions of section 795 to retrial of this case, the investigation of which took place some *six years* before those provisions were enacted. To invoke section 795 to exclude such evidence on retrial would be tantamount to giving the statute retroactive effect.

We therefore construe the regulatory provisions of Evidence Code section 795 as prospective only; section 795 will not apply to retrial of this case.[5] The standard we adopt today shall govern the admissibility of all prehypnotic evidence predating January 1, 1985—regardless of when such evidence was or may in the future be offered at trial.

In conclusion, evidence of events and descriptions that Marie both recalled and related to police officers prior to undergoing hypnosis, introduced by the prosecution through the testimony of Marie as well as those officers to whom she gave her prehypnotic statements, and any other testi-

---

child counselor certified in hypnosis by the Board of Behavioral Science Examiners and independent of and not in the presence of law enforcement, the prosecution, or the defense.

"(4) Prior to admission of the testimony, the court holds a hearing pursuant to Section 402 of the Evidence Code at which the proponent of the evidence proves by clear and convincing evidence that the hypnosis did not so affect the witness as to render the witness' prehypnosis recollection unreliable or to substantially impair the ability to cross-examine the witness concerning the witness' prehypnosis recollection. At the hearing, each side shall have the right to present expert testimony and to cross-examine witnesses.

"(b) Nothing in this section shall be construed to limit the ability of a party to attack the credibility of a witness who has undergone hypnosis, or to limit other legal grounds to admit or exclude the testimony of that witness."

[5] To the extent it holds to the contrary, *People* v. *Burroughs* (1987) 188 Cal.App.3d 1162, 1169 [233 Cal.Rptr. 872], is disapproved. The *Burroughs* court did not address the presumption of statutory prospectivity that we find clearly controlling in this case.

mony concerning subjects not discussed during the hypnotic session, will be admissible in any retrial of this case.

The judgment of the Court of Appeal is reversed with directions to reverse the judgment of conviction.

Lucas, C. J., Panelli, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment. In the course of its opinion, however, the majority hold that Evidence Code section 795 (hereafter section 795) does not govern the admissibility of prehypnotic evidence that predated its effective date of January 1, 1985, and hence will not apply to a retrial in this case. I write separately to express my disagreement with this point.

I recognize, of course, the principle that a new statute is ordinarily presumed to operate prospectively. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1206-1209 [246 Cal.Rptr. 629, 753 P.2d 585].) But I believe a well-settled corollary to that principle applies here, i.e., "procedural changes generally govern pending as well as future cases" (*Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 843, fn. 7 [239 Cal.Rptr. 292, 740 P.2d 404]), provided that vested rights are not adversely affected (see *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 394-395 [182 P.2d 159]). Under this rule our courts have often applied new procedural statutes to causes of action or proceedings arising from events that occurred before the statutes in question took effect. (See, e.g., *Vinson* v. *Superior Court, supra,* 43 Cal.3d 833, 843 [statute increasing showing of good cause required for discovery of plaintiff's sexual conduct in a sexual harassment suit]; *Woodland Hills Residents Assn.* v. *City Council* (1979) 23 Cal.3d 917, 930-932 [154 Cal.Rptr. 503, 593 P.2d 200] [statute authorizing award of attorney fees on "private attorney general" theory]; *Hogan* v. *Ingold* (1952) 38 Cal.2d 802, 812 [243 P.2d 1, 32 A.L.R.2d 834] [statute regulating stockholders' derivative suits]; *Lazelle* v. *Lovelady* (1985) 171 Cal.App.3d 34, 43-44 [217 Cal.Rptr. 145] [statute tolling five-year period for bringing case to trial when plaintiff voluntarily submits to arbitration]; *Pacific Coast Medical Enterprises* v. *Department of Benefit Payments* (1983) 140 Cal.App.3d 197, 204-205 [189 Cal.Rptr. 558] [statute creating remedy for enforcement of reimbursement rights of health care provider]; *Strauch* v. *Superior Court* (1980) 107 Cal.App.3d 45, 48-49 [165 Cal.Rptr. 552] [statute allowing malpractice plaintiff to file certificate of merit at time complaint is served].)

Section 795 is such a procedural statute, and it does not affect vested rights (compare, e.g., *Gutierrez* v. *De Lara* (1987) 188 Cal.App.3d 1575, 1579 [234 Cal.Rptr. 158]; *Perry* v. *Heavenly Valley* (1985) 163 Cal.App.3d 495, 504 [209 Cal.Rptr. 771]; *Collins* v. *Woods* (1984) 158 Cal.App.3d 439, 444-445 [204 Cal.Rptr. 650]). Under the foregoing rule, therefore, the statute applies to prehypnotic evidence offered at any trial—or retrial—beginning after its effective date, whether that evidence was developed before or after such date.

More important, section 795 is not merely a procedural statute; it is one of a subclass of procedural statutes that enact *rules of evidence,* and the foregoing analysis applies a fortiori to such rules. In California, rules for the admission or exclusion of evidence are now codified in the Evidence Code, which is governed by a special provision on applicability (Evid. Code, § 12). With the exception of the Evidence Code, the basic California codes contain a provision declaring that "No part of [this code] is retroactive, unless expressly so declared." (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, § 3; see also Lab. Code, § 4.) Such provisions codify the common law principle that statutes are presumed to operate prospectively. (*Evangelatos* v. *Superior Court, supra,* 44 Cal.3d 1188, 1207-1208.) But the Legislature included no such provision in the Evidence Code. On the contrary, Evidence Code section 12 conveyed a very different message: in subdivision (a) of that section the Legislature made the new code applicable to all trials beginning after its effective date (Jan. 1, 1967) *even as to causes of action arising from events occurring before that date.* And in a further provision particularly relevant here (*id.,* subd. (b)(1)), the Legislature made it plain that a new trial begun after the code's effective date was governed by the code "even if a previous trial in the same action was commenced prior to that date." (Assem. Committee on Judiciary com., 29B West's Ann. Evid. Code (1966 ed.) § 12, p. 7.)

The same rule governs statutes, like section 795, added to the Evidence Code *after* it took effect. For example, in 1982 an appellate court declared the rule that a criminal defendant was entitled to introduce, over objection, evidence of the results of a polygraph test he had taken. (*Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 [183 Cal.Rptr. 615].) In *People* v. *Seldomridge* (1984) 154 Cal.App.3d 362 [201 Cal.Rptr. 377], another defendant sought to introduce similar evidence, but the trial court excluded it. He appealed from the ensuing conviction, complaining inter alia that the ruling was erroneous under *Witherspoon.* While the appeal was pending, however, the Legislature changed the law by adding new section 351.1 to the Evidence Code, which declares that evidence of a polygraph test is inadmis-

sible unless all parties stipulate to its admission. The Court of Appeal in *Seldomridge* assumed arguendo that the exclusion of the polygraph evidence was erroneous under the law in effect at the time of trial, but nevertheless affirmed the conviction. It reasoned that the new statute could and would apply in any retrial of the charge, and that the polygraph evidence would then be inadmissible under that statute: "at a new trial appellant would not be permitted to introduce the offered polygraph evidence. Reversal on the ground that the evidence should have been admitted when it would not be available to appellant on a retrial would be a useless and futile act and would be of no benefit to appellant." (*Id.* at p. 365.)

Directly in point here is *People* v. *Burroughs* (1987) 188 Cal.App.3d 1162 [233 Cal.Rptr. 872]. In my view, *Burroughs* is correct and should not be disapproved. In that case, as here, the victim was hypnotized by a police officer prior to January 1, 1985; the victim testified against the defendant; the defendant was convicted; and the judgment was reversed under the rule of *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], and *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635]. On the date set for retrial the defendant again moved to exclude the victim's testimony on *Shirley-Guerra* grounds. The trial court granted the motion, then dismissed the prosecution after the People announced they were unable to proceed without the victim's testimony. The People appealed, contending that at least the victim's prehypnotic testimony should be admissible in a retrial.

The Court of Appeal affirmed the judgment of dismissal. The court correctly noted that the victim's prehypnotic testimony would not meet several of the preconditions to admissibility now prescribed by section 795, and turned to the question whether the statute would apply to a retrial. Although the People argued that such application would be "retroactive" and therefore impermissible, the court held otherwise. It relied on the principle that "Generally, the rules of evidence in effect at the time of trial govern the admissibility and exclusion of evidence at that trial," citing, inter alia, Evidence Code section 12. (188 Cal.App.3d at p. 1167.) Under this principle, the court observed, "It is not uncommon that admissibility of evidence be judged by a standard which was not in effect when the evidence came into being." (*Ibid.*) The court concluded that section 795 would apply to a retrial even though the statute had not taken effect until after the victim had been hypnotized: "We conclude section 795 as enacted *applies to hypnosis prior to its effective date* where the evidence is proffered at a trial beginning after January 1, 1985." (*Id.* at p. 1169, italics added.) In my view the reasoning of *Burroughs* is sound and its result is correct.

Accordingly, while I agree that we should direct reversal of the judgment, I would advise the trial court that section 795 will apply to any retrial in this case.

Broussard, J., concurred.