Filed 8/19/22  P. v. Astorga CA2/4
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARIC AARON ASTORGA,<br><br>    Defendant and Appellant. | B302888<br>(Los Angeles County<br> Super. Ct. No. BA438063)<br><br>OPINION FOLLOWING<br>TRANSFER FROM<br>SUPREME COURT |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed in part and remanded.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo, Acting Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

In August 2019, a jury convicted appellant Aric Aaron Astorga of one count of first-degree murder (Pen. Code, § 187, subd. (a)).[1] The jury also true the allegations that appellant had personally and intentionally discharged a firearm (§ 12022.53, subd. (d)), and committed the murder for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). Appellant was sentenced to 25 years to life for first-degree murder (§ 190, subd. (a)), plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The court elected not to impose an additional 10-year term under the gang enhancement (§ 186.22, subd. (b)(1)(C)), and instead set a 15-year minimum term of parole eligibility (§ 186.22, subd. (b)(5)).

In his direct appeal, appellant challenged only the sufficiency of the evidence to support the jury's finding sustaining the gang enhancement. Appellant did not challenge his murder conviction. In an opinion filed in March 2022, we rejected appellant's argument and affirmed the judgment. (*People v. Aric Aaron Astorga* (Mar. 4, 2022, B302888) [nonpub. opn.].)

Appellant petitioned for review in the California Supreme Court and requested that the Court review whether the evidence adduced at trial was sufficient to support the gang enhancement under Assembly Bill No. 333 (2021-2022 Reg. Sess.) (A.B. 333), which went into effect after appellant's trial but before the parties completed briefing in his direct appeal. A.B. 333 amended section 186.22 to require proof of additional elements to establish a gang enhancement. A.B. 333 also added section 1109 to the Penal Code,

---

[1] Subsequent statutory references are to the Penal Code unless otherwise indicated.

which provides that that "[i]f requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases." (§ 1109, subd. (a).)

The Court granted review and transferred the case to this court with directions to vacate our previous decision, and to reconsider the case in light of A.B. 333. We now vacate our March 2022 opinion, and issue this opinion considering the effect of A.B. 333. We conclude that current section 186.22, as amended by A.B. 333, applies to this case and requires vacating the jury's gang enhancement finding. We reject appellant's contention that section 1109, as enacted by A.B. 333, mandates a reversal of his underlying conviction for first-degree murder. We reverse the gang enhancement finding, and remand the matter to allow the People to retry the gang enhancement allegation in accordance with the new law. In all other respects, we affirm.

## FACTUAL BACKGROUND

A.    *The Murder*

In the early morning hours of November 14, 2014, deputies from the Los Angeles County Sheriff's Department responded to a warehouse complex in the City of Los Angeles. After walking through a gated fence and into the warehouse yard, the deputies discovered the body of Luciano Rubio lying face down in a pool of blood near an open doorway to the warehouse. Rubio had been pistol whipped and shot three times with a .357 magnum revolver: twice in the right shoulder and once in the back of the head. He was pronounced dead around 6:00 a.m.

Inside the warehouse, investigating officers located a living space with couches, a table, and a large television. Criminalists collected fingerprints

3

from a cup and Gatorade bottle inside the warehouse. The fingerprints matched those of Michael Perdomo, a gang member who went by the name "Little P." According to Rubio's best friend, Jose Perez, on November 12, 2014 (two days before the murder), Rubio was with Perez and Perdomo inside the warehouse. While hanging out, Perdomo accused Rubio of raping Perdomo's former girlfriend (and the mother of his child).[2]

The investigating officers and criminalists also searched an adjacent junkyard that was located on the opposite end of a retaining wall. Shoe print impressions were collected from the bed and hood of a pickup truck that had been parked against the wall. Palmprints and fingerprints were lifted from the bed, passenger side hood, and top of the truck. Subsequent comparisons showed that the fingerprints matched appellant's, and the shoeprints matched the sole pattern of a pair of appellant's shoes.

B.    *Appellant's Arrest*

On January 12, 2015, Baldwin Park Police Department Officer Mike Hemenway pulled behind a suspected stolen vehicle. After following the car into a parking lot, Officer Hemenway watched Alexandro Coto-Martinez get out of the vehicle and flee. As he chased Coto-Martinez on foot, Officer Hemenway called for support. Officer Martin Herrera located the stolen vehicle and quickly realized it had been abandoned. After searching the area for several minutes, Officer Herrera stopped appellant, who was short of breath and "sweating profusely."

---

[2]    Originally charged as a codefendant in this case, Perdomo was not tried alongside appellant.

4

A loaded .357 revolver was recovered approximately 12 feet away from where Officer Hemenway detained Coto-Martinez. Later analysis showed that the three bullets recovered from Rubio's body had been fired by the recovered .357 revolver, and that appellant's DNA was present on the gun trigger and trigger guard.

C.     *The Jailhouse Conversation*

In July 2015, appellant was placed in a jail cell with an inmate who portrayed himself as a member of the Huntington Park Locos who had spent several years in prison. Unknown to appellant, the inmate was cooperating with the police. The conversation was recorded, and the recording was played for the jury, with a transcript for assistance.

During his conversation with the inmate, appellant introduced himself as "Twisted" from Eastside Bolen, and said he was a "big dude" in the gang who had come up from the Rascals, a clique or subset of the gang. The inmate told appellant he had "just met [his] home boy" from Eastside Bolen. Appellant described his gang participation as "all the time every time." He said that in the last "couple months everybody knew [to] watch out for" appellant, because he was known for "running up on people" with a .357 revolver and .44 magnum. Prior to his arrest, appellant had been "on it" with the .357 revolver.

In describing the murder of Rubio, appellant said that he had heard a rumor that a "homie's baby momma" had been raped. One day, a guy named "Suso," a "homie" who "bangs with [appellant's] clique," introduced appellant to his "uncle," an older gang member named Little P. Little P. was not from appellant's neighborhood, but was a self-proclaimed member of a gang in

Duarte.[3]  Little P. told appellant that the woman named in the rumor was his former girlfriend.  Little P. told appellant "we're going to see what you're about . . . you know, (inaudible) homie.  You hear me?"  Appellant replied, "you want to pressure me, I'll show you who the fuck I am."

Appellant "roll[ed] around" in a car with Little P. and Suso for two-to-three hours before traveling to a warehouse to find the man who had raped Little P.'s former girlfriend.  When they arrived, Suso kept watch outside while appellant and Little P. went into the warehouse.[4]

Appellant found Rubio laying on a couch inside the warehouse.  Appellant approached Rubio and pistol whipped him several times before he "let off three times" with his gun, dropping Rubio "like a sack of potatoes."  After the shooting, appellant got into the car, emptied the revolver into his pocket,[5] and reloaded the gun "in case the fools I'm with start getting fucking stupid."

After the shooting, appellant never saw Little P. again.  Appellant thought maybe Little P. had "pretend[ed] like he was connected" to persuade appellant to killing Rubio.

---

[3]    An investigating officer testified that he had met Perdomo in connection with this case.  The officer testified that Perdomo was extensively tattooed and had "Duarte Eastside" tattooed across his back.  The inmate with whom appellant was speaking told appellant that he had "heard that name [Little P.] before."

[4]    Earlier in the conversation, the inmate asked appellant if he was with people "[f]rom the hood."  Appellant stated, "No.  One of them was, but he was keeping watch outside."  Appellant subsequently stated that Suso wanted to be in his "hood," but "ain't no way it's going down after that, you hear me."

[5]    No shell casings were recovered at the scene of the murder.

6

D.    *The Gang Expert and Evidence*

The prosecutor called Rialto Police Department Officer Adam Acuna to testify as an expert on gang activity in Baldwin Park. Prior to his current assignment, Officer Acuna was an officer with the Baldwin Park Police Department for approximately 11 years. Officer Acuna explained that Eastside Bolen originated in Baldwin Park around the late 1950's. The gang has five different subsets or "cliques": the Midget Charros, Charros, Locos, Dukes, and Rascals. Eastside Bolen was responsible for vandalism, theft, robbery, burglary, assault, and murder. Acuna testified that he had previously made contact with appellant, who previously admitted being a member of Eastside Bolen during a consensual encounter.

According to Officer Acuna, reputation, respect, and fear are important in gang culture. A gang makes itself known "[b]y fear, intimidation. By the crimes they commit. By how bold they want to be as far as their criminal activity." Also important is an individual's reputation within a gang, and the reputation of the gang itself. A gang member gains reputation and respect by defending the reputation of the gang and by committing crimes. The more severe the crime, "the more fear you put into the public, you're gonna [*sic*] gain more status." Murder is considered "the highest level of respect" a member could gain for the gang. From that point forward, if the gang wanted "to commit a crime or . . . sell drugs and people know that you're Eastside Bolen and Eastside Bolen is willing to kill somebody, then they're not gonna [*sic*] necessarily mess with you." Falsely claiming to have committed a crime could result in lost respect for the gang member or his gang.

The prosecutor posed a hypothetical question mirroring the facts as established by the trial evidence, asking whether the murder of Rubio was

committed for the benefit of Eastside Bolen.[6] While acknowledging there could be other motivations behind the Rubio murder,[7] Officer Acuna replied that in his expert opinion, the murder was committed for the benefit of the gang. He explained: "This individual is being challenged as to what his gang status and his gang . . . is about by going and pushing—once he's challenged and he's pushing forward with this crime . . . and in taking that next level of executing another human being, . . . his résumé is elevated to another status." The murder would also "elevate the status of Eastside Bolen," as "this individual would be a representation of Eastside Bolen. . . . There's another individual from . . . from Eastside Bolen that is willing to commit a crime such as that."

The prosecution introduced certified court dockets of three other Eastside Bolen members: Gary Galvez, Sivar Osorio, and Arthur Monarque. The dockets established that between March 2015 and January 2018, Galvez, Osorio, and Monarque had each been convicted of assault (§ 245) or selling

[6]    "If a member of a gang was in another area outside of his territory and he was speaking to someone who he thought was a member of a different gang, not his rival gang but a different gang, and that person started kind of challenging him saying, like, what are you about? And started talking about how a big homie or someone high up in the gangs' girlfriend or old lady was raped. And that individual agreed to go out with this person, climbed a fence, went in, beat the alleged rapist, and then shot the alleged rapist three times, do you have an opinion of if that crime would have been done for the benefit of, at the direction of, or in association with a criminal street gang?"

[7]    On recross-examination, Acuna agreed that the gang member who had committed the murder in the hypothetical could have harbored motivations beyond his or her gang. Acuna testified that the killer could "simply have a hatred towards people who they believe are rapists."

narcotics (Health & Saf. Code, § 11378).[8]  After admitting these exhibits into evidence, the court admonished the jury that the crimes committed by Galvez, Osorio, and Monarque "had nothing to do with the events leading up to or the fact of this prior conviction.  But it's part of proving whether or not Eastside Bolen is a criminal street gang.  That's the only way you can consider that evidence."

E.    *Defense Evidence*

Appellant called Perdomo's former girlfriend to testify on matters not relevant to this appeal.

F.    *Relevant Jury Instructions*

As part of its instruction to the jury on homicide and murder, the court informed the jury that "[t]he people are not required to prove that [appellant] had a motive to commit any of the crimes charged."  However, "[h]aving a motive may be a factor tending to show that [appellant] is guilty.  Not having a motive may be a factor tending to show [appellant] is not guilty."

The court also instructed the jury on former section 186.22.  Under that instruction, the People were required to prove beyond a reasonable doubt that appellant "committed the crime for the benefit of, at the direction of, or in association with a criminal street gang," and "intended to assist, further,

---

[8]    The certified court dockets established a March 2015 conviction of Gary Galvez for selling narcotics (Health & Saf. Code, § 11378); a November 2016 conviction of Sivar Osorio for also selling narcotics (*ibid.*); and a January 2018 conviction of Arthur Monarque for assault and unlawful possession of ammunition and a firearm (§§ 245, 30305, subd. (a)(1); former § 29800, subd. (a)(1)).

or promote criminal conduct by gang members."[9]  In the event the jury found appellant guilty of murder, it could "consider that crime in deciding whether one of the group's primary activities was commission of that crime, and whether a pattern of criminal gang activity has been proved."  (Former CALCRIM No. 1401.)

## DISCUSSION

Appellant does not challenge the sufficiency of the evidence to support his conviction for murder, or the jury's finding that he personally discharged a firearm during the commission of the murder.  Instead, appellant contends, and the Attorney General agrees, that the amendments made by A.B. 333 to the gang enhancement (§ 186.22, subd. (b)) apply retroactively to this case.  Appellant also contends that section 1109, as enacted by A.B. 333, applies retroactively to this case and compels a reversal of his underlying conviction for murder.

---

[9]     The jury instruction defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal:  [¶]  1.  That has a common name or common identifying sign or symbol;  [¶]  2.  That has, as one or more of its primary activities, the commission of murder, attempted murder, robbery, assault with a firearm, felon in possession of a firearm and sales of narcotics;  [¶]  AND  [¶]  3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity."

The instruction also defined a "pattern of criminal gang activity" as "1. The commission of murder, attempted murder, robbery, assault with a firearm, felon in possession of a firearm, and sales of narcotics;  [¶]  2. At least one of those crimes was committed after September 26, 1988;  [¶]  3. The most recent crime occurred within three years of one of the earlier crimes;  [¶]  AND  [¶]  4. The crimes were committed on separate occasions, or were personally committed by two or more persons."

10

We agree that the amendments to section 186.22 apply retroactively in this case. Moreover, because the record does not demonstrate that the jury received complete instruction under the law, and because the record evidence is insufficient to support a finding under the current law, we vacate the true finding, strike the portion of appellant's sentence imposed under section 186.22, subdivision (b)(5), and remand the matter to afford the People the opportunity to retry the gang allegation. We reject appellant's remaining contention concerning section 1109.

1.    *Assembly Bill No. 333*

While appellant's direct appeal was pending, A.B. 333 (Stats. 2021, ch. 669, §§ 1-5) became effective. A.B. 333 amended the gang enhancement statute to impose additional elements beyond those already in place to establish a gang enhancement. A.B. 333 also enacted section 1109 to the Penal Code, which provides in relevant part for the bifurcation of trial, upon the defendant's request, of the gang enhancement allegations charged under section 186.22, subdivision (b).

2.    *Current Section 186.22*

The parties agree, as do we, that the amendments to section 186.22 should be applied retroactively to the gang enhancement under section 186.22, subdivision (b)(1)(C) in this case, and that under the current law, there is insufficient evidence to support imposition of that enhancement.

Section 186.22 provides for an enhanced punishment whenever the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang

11

members." (§ 186.22, subd. (b)(1).) "A.B. 333's amendments to section 186.22 apply retroactively to cases like the one here, in which the judgments of conviction have not become final prior to the effective date of A.B. 333." (*People v. Lee* (2022) 81 Cal.App.5th 232, 237 (*Lee*), citing *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344 (*Lopez*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*).)

We also agree that the amendments require the reversal of the gang enhancement under section 186.22. Prior to the amendments made by A.B. 333, a criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) A "'pattern of criminal gang activity'" was defined as "the commission of . . . two or more of [the enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).)

The court instructed the jury in this case consistent with these definitions under former section 186.22. (See fn. 12 *ante*; former CALCRIM No. 1401.) Also consistent with former section 186.22, the court instructed the jury that the predicate crimes used to establish a pattern of criminal gang activity and criminal street gang "need not be gang-related."

A.B. 333 became effective on January 1, 2022, while appellant's direct appeal was pending. A.B. 333 modified the definition of criminal street gang

to now require "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Current § 186.22, subd. (f), italics added.) A.B. 333 also redefined "'pattern of criminal gang activity'" to mean "the commission of . . . two or more [enumerated criminal acts], provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, *the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational.*" (Current § 186.22, subd. (e)(1), italics added.)

In light of the foregoing amendments, "imposition of a gang enhancement [now] requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*Lopez, supra*, 73 Cal.App.5th at p. 345, quoting § 186.22, subds. (e)(1)-(2).) The statute also sets forth examples "of a common benefit that are more than reputational," which include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or

13

silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Under the harmless-error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), "the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute the th[e] jury's verdict.' (*People v. Flood* (1998) 18 Cal.4th 470, 504.)" (*E.H., supra*, 75 Cal.App.5th at p. 479; *People v. Sek* (2022) 74 Cal.App.5th 657, 668–670; see *People v. Merritt* (2017) 2 Cal.5th 819, 826–831 [instructional error involving the omission of multiple elements subject to harmless error review].)

Here, to prove Eastside Bolen was a criminal street gang under former section 186.22, the prosecution submitted evidence that three known Eastside Bolen gang members (Gary Galvez, Sivar Osorio, and Arthur Monarque) had each been convicted of assault or selling narcotics (§ 245; Health & Saf. Code, § 11378) between 2015 and 2018. However, the prosecution did not introduce evidence (required by the amendments of A.B. 333) that those predicate offenses commonly benefitted Eastside Bolen, or that the common benefit of the predicate crimes was more than reputational. Nor was the jury instructed to determine these additional elements; on the contrary, the jury was instructed that it need not find the predicate offenses gang-related. On this record, we cannot conclude beyond a reasonable doubt that the omission of the new elements in section 186.22 did not contribute to the jury's verdict. The true finding under section 186.22 must be vacated, and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amended law. (*Lee, supra*, 81 Cal.App.5th at p. 239; *Lopez, supra*, 73 Cal.App.5th at p. 346; *E.H., supra*, 75 Cal.App.5th at p. 480.)

14

3.    *Section 1109*

According to appellant, the procedural provision of section 1109 requiring a bifurcated trial of gang enhancements upon the request of a defendant applies retroactively to judgments not yet final on appeal.  On that premise, he contends that the failure to bifurcate the gang enhancement at his trial requires reversal of his convictions, because had there been a bifurcation, the jury would not have heard the prejudicial gang evidence in determining his guilt of the charges.

California courts are currently split on the issue of retroactivity. (Compare *People v. Montano* (2022) 80 Cal.App.5th 82, 105–108 [§ 1109 applies retroactively]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 (*Ramos*) [same]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–568, rev. granted July 13, 2022, S274743 [same]; with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 (*Ramirez*), rev. granted Aug. 17, 2022, S275341 [§ 1109 does not apply retroactively]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207 (*Perez*), rev. granted Aug. 17, 2022, S275090 [same].)  Consistent with our prior decisions on this issue, we conclude that section 1109 does not apply retroactively to this case.  (Accord, *Ramirez*, *supra*, 79 Cal.App.5th at p. 65; *Perez*, *supra*, 78 Cal.App.5th at p. 207; see also *People v. Hayes* (1989) 49 Cal.3d 1260, 1264.)

In any event, even were we to apply section 1109 retroactively to this case, any failure to bifurcate under section 1109 was harmless, regardless of whether we use the standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), or *Chapman, supra*, 386 U.S. 18.  (See *Watson, supra*, at p. 836 [state law error requires reversal only if it is reasonably probable that the error had an effect on the verdict]; *Chapman, supra*, at p. 24 [reversal is

15

required under the federal Constitution unless the error was harmless beyond a reasonable doubt].)

First, a large portion of the gang evidence would have been admitted in the first stage of any bifurcated trial, as that evidence was relevant to appellant's motive to commit the murder. According to the recorded jailhouse conversation, appellant was introduced to an older gang member (Little P.) through one of appellant's "homies" (Suso) who had "bang[ed]" in appellant's clique. It was only after Little P. challenged appellant's status in Eastside Bolen that appellant agreed to kill Rubio. To explain why a gang member like appellant would be motivated to kill a complete stranger, Acuna testified that committing such crimes would maintain or elevate a gang member's status within a gang, or to increase the gang's overall reputation in the community. Obviously, evidence of this gang-related motive for the killing was admissible as relevant to the substantive offense. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [evidence of motive probative of premeditation and deliberation]; *People v. Smith* (2005) 37 Cal.4th 733, 741 [evidence of motive often probative of intent to kill]; see also *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [gang evidence relevant to establishing motive and identity].)

Second, any gang evidence that was introduced for purposes other than establishing motive was relatively sanitized. To prove Eastside Bolen was a criminal street gang within the meaning of section 186.22, the prosecution introduced certified court dockets in which other Eastside Bolen members had been convicted of assault or selling narcotics. This evidence, which established predicate offenses far less serious than the current charge of murder, did not bear on appellant's own criminal conduct.

16

Third, the jury admonitions and instructions prevented the jury from using any gang evidence to establish appellant's bad character or disposition to commit crime. Absent any showing by appellant to the contrary, we presume the jurors followed these instructions. (*People v. Krebs* (2019) 8 Cal.5th 265, 335; see also *Ramos, supra,* 77 Cal.App.5th at p. 1132 ["the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed"].)

Finally, there was compelling evidence of appellant's guilt beyond use of gang evidence in this case. Through his own confession, appellant provided details of the Rubio murder that were corroborated by the physical evidence appearing at the scene. As appellant had described, Rubio was found pistol whipped and shot three times, once in the back of the head, by a firearm containing appellant's DNA. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 957 [execution-style shooting at close range may establish premeditation and deliberation]; *People v. Bolin* (1998) 18 Cal.4th 297, 332–333.) Fingerprint and shoeprint impressions matching appellant's were found on the area near the warehouse retaining wall, verifying appellant's confession that he had sneaked into the warehouse to kill Rubio. In light of the foregoing, we find no reasonable probability of a different result in a bifurcated trial, and find any purported error harmless beyond a reasonable doubt.

//

//

//

//

17

## DISPOSITION

The true finding on the gang enhancement allegation (§ 186.22, subd. (b)) is vacated, the related sentence on the enhancement (§ 186.22, subd. (b)(5)) is stricken, and the matter is remanded to the superior court. On remand, the People shall decide whether to retry appellant on the gang enhancement allegation (§ 186.22, subd. (b)). If the People elect not to retry this allegation, the superior court is directed to resentence appellant by striking the minimum term of parole eligibility under section 186.22, subdivision (b)(5). If the People decide to retry appellant on the gang enhancement allegation, and if the allegation is found true, the court shall resentence appellant according to applicable law.

Upon determination as to the status of the gang enhancement allegation (no retrial, or retrial and final resolution), the clerk of the superior court shall prepare an amended abstract of judgment for appellant reflect the appropriate modifications, and forward it to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.

18