251 N.J. Super. 300 (1991)
598 A.2d 216
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN W. DREHER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1991.
Decided October 4, 1991.
*302 Before Judges ANTELL, O'BRIEN and KEEFE.
Robert L. Weinberg argued the cause for appellant on A-4754-88T5 (Williams & Connolly, of the D.C. bar, and Orloff, Lowenbach, Stifelman & Siegel, attorneys; Robert L. Weinberg, Paul Mogin and Allen P. Waxman, of the D.C. bar, and Laurence B. Orloff and Bruce N. Stratvert, of counsel and on the brief).
Herbert J. Stern argued the cause for appellant on A-556-90T5; Williams & Connolly and Stern & Greenberg, attorneys; Herbert J. Stern, Jeffrey Speiser, Robert L. Weinberg, Paul Mogin and Allen P. Waxman, of counsel and on the brief).
Joseph Connor, Jr., Assistant Prosecutor, argued the cause for respondent (W. Michael Murphy, Jr., Morris County Prosecutor, attorney; Joseph Connor, Jr., on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
After a trial by jury, defendant was convicted of the purposeful and knowing murder of his wife, Gail B. Dreher, contrary to N.J.S.A. 2C:11-3a(1) and (2). He was also convicted of possession *303 of a knife under circumstances not manifestly appropriate for such lawful uses as it may have, contrary to N.J.S.A. 2C:39-5d, possession of a knife with the purpose to use it unlawfully against another, contrary to N.J.S.A. 2C:39-4d, and conspiracy to commit murder, contrary to N.J.S.A. 2C:11-3a and 2C:5-2. The latter convictions were merged into the murder conviction and the court sentenced defendant to life imprisonment with a 30-year period of parole ineligibility. Defendant was also ordered to pay a $1000 penalty to the Violent Crimes Compensation Board. He now appeals from that judgment of conviction, dated April 17, 1989. He also appeals from orders dated August 2 and August 8, 1990, denying his motions for a new trial and for a jury recall. Defendant's motions were based upon claims of irregularities during the jury's deliberations. We now consolidate on our own initiative both appeals for purposes of review.
At 3:32 p.m. on the afternoon of January 2, 1986, the Chatham Township police department received a telephone call from defendant, who had just returned home from work, reporting that his house had been burglarized. Five minutes later, in a second telephone call, he requested that the police hurry, stating that "I think my wife is dead." When the police arrived at defendant's home he led them to the basement where they found decedent's lifeless body. The lower part of her form was in a prone position, and her head was suspended by a ligature which passed about her neck and around a "Lally" column at a height of 15 or 16 inches above the floor. The ligature also circled decedent's right arm at three places and around her left wrist so that her hands were tied behind her. The body had sustained a number of bruises and twelve stab wounds, some of which penetrated the pleural spaces and the jugular vein. The face was battered and decedent's lips were deeply cyanotic, as were her ears and nail beds. Death was found to have been caused by strangulation. The deep furrows around her neck above the larynx suggested that the ligature was the instrumentality of death.
*304 A detective observed that defendant's knuckles were red and swollen, that he had nicks on his hand and a cut on the small finger of his right hand. Defendant said that he might have hurt himself playing squash early that morning. His playing partner, however, testified that defendant did not fall, run into a wall or injure himself in any way.
Signs of intrusion were evident in the second floor master bedroom. Jewelry and jewelry boxes were on the floor, night stand drawers and an armoire drawer had been pulled out and their contents scattered. The bed was in disarray. No other rooms upstairs had been disturbed. No signs of a forced entry were noted.
The State's case against defendant was crucially dependent upon the testimony of Nancy Seifrit, which was given under a grant of use immunity pursuant to N.J.S.A. 2A:81-17.3. Seifrit, who was named but not indicted as a co-conspirator to the killing, and defendant first met in late 1984 or early 1985 in a bar in El Paso, Texas. Defendant occasionally visited El Paso on business and the two developed an intimate relationship which continued through April 1987.
In March 1985, Seifrit was transferred by her company to Chicago. She stayed in telephone contact with defendant on a daily basis and they met whenever defendant was in Chicago. In October 1985  approximately three months before the homicide  Seifrit moved to the east coast, first staying in Pennsylvania with her mother and then moving to Chatham, New Jersey, where defendant resided with his family. She stated that she made the move at defendant's behest, that she was in love with defendant and that she wanted to be near him. They then began seeing each other on a regular basis, with defendant visiting Seifrit's apartment on weekday mornings at about 5:00 or 5:30 a.m.
Seifrit testified that early in the relationship defendant asked her what she would think if he were to kill his wife. She stated that she dismissed the suggestion by calling defendant an *305 "asshole," without any further response. At another time defendant asked about a gun that he knew Seifrit kept and asked her to bring it to him in New Jersey. Although Seifrit flew from Chicago to New Jersey with the gun, their plan was aborted. Defendant had given her a map showing where she should meet him with the weapon at the bottom of his street in Chatham, but at the time designated for the delivery defendant drove by, not even acknowledging her as he passed. Seifrit testified that defendant later explained he had been unable to stop because his father was in the car with him. Defendant and his father lived on the same street and it was their regular practice to drive together to work at the leather company which the two operated in Newark. No further attempt was made to transfer the gun to defendant.
According to Seifrit, defendant told her that he was "unhappy" in his marriage, that "things ... were happening at the house that he didn't like when he was out of town" and that the "problems in the marriage" worsened during holiday times.
At approximately 4:30 a.m. on January 2, 1986, defendant came to Seifrit's apartment. He appeared to be "upset." He had had a New Year's "that was not what he had planned. Christmas  he talked about Christmas was not happy, there was fighting." She testified that defendant "wanted to settle things that day, he was just tired of what was going on. He asked me if I would come over to the house and let him introduce me as the other woman. He felt  he told me that it would help him out."
Seifrit reluctantly agreed to defendant's request. He told her to be at his house at 7:30 a.m. and to dress to "look good."
At the prearranged time, Seifrit drove to defendant's house which she entered through the door in the garage. Stepping in, she saw defendant in the doorway leading downstairs to the basement. He was saying "move, just move" while another voice (the decedent's) was "just saying, `please,' begging, `do what you want, I don't care, please.'"
*306 After composing herself in the bathroom Seifrit heard defendant summon her downstairs, and as she started down she saw the soles of Gail's bare feet. She "saw what was going on" and went back upstairs. As she did, defendant again called her, saying "I need help. I need something sharp, a knife, scissors, something." Seifrit then returned to the basement and threw defendant a knife she had taken from the kitchen. She saw that Gail, whose face was then blue, seemed to be kneeling before a pole in the cellar and that defendant "was behind the pole pulling on the string." Letting go of the string with one hand he picked up the knife which Seifrit had thrown to him, "brought his arm around and stabbed his wife in the throat."
At that point, Seifrit stated that she "choked, I was just upset." Again, she visited the bathroom and then entered the kitchen where she waited for about five minutes for defendant to come back upstairs. When he returned he went to the hall closet and handed Seifrit a fur coat, and at his instructions she put it in her car. Thereafter, the two went up to the master bedroom where they emptied the contents of a jewelry box into a pillow case, and then busied themselves to give the bedroom and the den downstairs the appearance of having been ransacked by a burglar. Defendant told Seifrit that he had to leave because he could not be late picking up his father for work. Before leaving, he said that she should take certain jewelry from the pool table in the basement and to make sure "everything was done."
After defendant left, Seifrit returned to the basement and struck Gail over the head with a metal cobbler's last which she found on the pool table. The blows left three crescent-shaped wounds which penetrated the skin to expose the underlying skull bone. She also stabbed Gail's body several times with the kitchen knife which she then put in the pillow case with the jewelry and left the basement.
Seifrit drove back to her apartment and after discarding the pillow case and its contents she telephoned defendant at his *307 office. When defendant asked if "everything was done" she told him that she had gotten rid of the jewelry, and that she had hit and stabbed Gail's body. Defendant then asked her if she had taken the earrings off the pool table. When Seifrit said that she never saw any earrings, defendant replied: "Don't worry about it, I'll take care of it."
Seifrit's phone bill showed that the call to defendant's office was made at 8:49 a.m. and that it lasted for 10 minutes. At 9:30 a.m. that morning defendant called Seifrit back to reassure her that "everything will be alright," and to be sure that she had gotten rid of all the jewelry. The record is silent as to the location from which that call was made. No toll records were offered by either party as to this question which proves to be of some significance for reasons which we will now relate.
To corroborate Seifrit's testimony that in her first conversation with defendant he stated, with regard to the earrings left on the pool table, "Don't worry about it, I'll take care of it," the State undertook to prove that immediately after that telephone call defendant returned from his office in Newark to his home in Chatham to do three things: (1) remove the earrings from the pool table in the belief that their presence would belie the theory of a burglary, (2) to let the family's two dogs in from the back yard and, finally, (3) to kick Gail's body to insure that it was dead. In this connection, certain time sequences became highly relevant.
The proofs appear to be undisputed that it normally takes 35-40 minutes to travel between defendant's office and his home, but that it can be done in 25-30 minutes when traffic is light. Defendant's vehement challenge to the theory of his return to the house after finishing that telephone conversation at 8:59 a.m. is based upon uncontradicted testimony by two employees that shortly after 10:00 a.m. he left his office to go to a nearby bank where he made a deposit which was recorded by the bank at 10:09 a.m. Two other employees testified to seeing him in the office at 9:15 and 9:30 a.m. respectively.
*308 In support of its contention that defendant made the round trip from office to home between 9:00 and 10:00 a.m., the State relied upon the testimony of Austin Lett. Lett testified to seeing defendant's car leaving defendant's driveway at approximately 9:35 a.m. It also relied upon the opinion evidence of the County Medical Examiner that Gail's body had in fact been moved approximately one hour after death, and that death probably occurred around 7:40 a.m. Defendant challenges the testimony of Austin Lett on the ground that it was hypnotically developed in violation of the guidelines prescribed in State v. Hurd, 86 N.J. 525, 543-546, 432 A.2d 86 (1981). He also asserts that the medical examiner's opinion should not have been received in evidence because it had been willfully withheld by the State in violation of its duty to provide continuing discovery to the defendant prior to and during the trial.

Admission of Pre-Hypnotic Recollection
According to Lett, who lived across the street from defendant, his report to the police was that he had seen defendant's car leaving the driveway on the morning of January 2 at 9:15 a.m., give or take 20 minutes, but that he could not discern who was actually driving it. The police report states that the sighting was made at 9:15 a.m. In an effort to reconcile Lett's information with information furnished by another neighbor to the effect that she had seen defendant's car leave his house at 7:30 a.m. and return at about 7:45 a.m., and then again saw the car at a nearby intersection at 8:15 a.m., the police requested Lett to submit to hypnosis by a psychiatrist in an effort to sharpen his recollection as to the time he saw the car and who was driving it. The session was conducted on January 23, 1986.
It is important to note that in the pre-hypnotic interview with the psychiatrist Lett firmly stated as his best recollection that the correct time was 9:35 a.m. Both the pre-hypnotic, the hypnotic and the post-hypnotic sessions were recorded on video tape. While under hypnosis Lett remembered that the time he *309 saw defendant's car was 9:35 and that he could recognize the driver of the car as the defendant. The trial court, after a Hurd hearing, excluded any testimony by Lett identifying defendant as the driver of the car. In addition to the Hurd violations the court also heard the testimony of an ophthalmologist that under the physical circumstances described it would have been impossible for Lett to discern the details of the driver's features to which he had testified. However, the court permitted Lett to testify that the sighting of the car occurred at approximately 9:35 a.m., and defendant challenges the admission of this evidence. In our view, the court's ruling was correct.
Pointing to numerous violations of the Hurd guidelines in Lett's hypnotic session, defendant argues that once a witness has been hypnotized, violation of those requirements requires that all of that witness's testimony be deemed tainted, and hence inadmissible. He argues that the exclusion must apply even to that portion of the testimony which recites events recalled prior to the hypnotic session. The State replies that such testimony is not excluded as a matter of law, but that its weight and credibility must be resolved in the sound discretion of the jury. Although Lett testified on direct examination that the sighting of defendant's car occurred at "approximately 9:30 in the morning," he conceded on cross-examination that his previous estimates placed the sighting at sometime between 9:15 a.m. and 9:35 a.m. and that the police report records him as saying 9:15.[1] Thus, the jury was fully able to make the credibility determination necessitated by the possible inconsistency. In our view, admissibility is controlled by the fact that his trial testimony was consistent with his recollection as stated in the recorded pre-hypnotic interview with the hypnotist.
*310 Defendant's argument that, because of the hypnotic session, Lett's trial testimony was delivered with an aura of confidence which it would not otherwise have had is not persuasive. The memory-hardening process is an intrinsic part of a witness's preparation for trial. While ordinarily it takes the form of numerous pretrial interviews and interrogations by counsel, the result is the same as that which defendant claims occurred here: a witness who testifies with conviction and believability. The fact that a witness has been prepped to testify effectively does not disqualify his evidence so long as it has not been falsified.
Although Dr. Martin Orne, a research scientist, expert on the subject of hypnosis, was available to testify on defendant's behalf, no scientific basis was entered upon the record as to why Lett could not reliably testify to his pre-hypnotic recollection. Rather than impeach Lett's credibility by telling the jury that he had been hypnotized and by having Dr. Orne explain why his testimony was tainted, the defendant's strategy was to assail Lett as a biased witness who had a personal grievance against defendant and because he was an alcoholic.[2]
At the time of the hypnotic session on January 23, 1986, the police were not even aware of the telephone call between Seifrit and the defendant which ended at 8:59, had not seen any toll records and were unaware of any need to harmonize the time of Lett's observation with the narrow time frame within which defendant would have to be limited in driving home and then back to the office. The reason for the interview, as we explained earlier, was to explore Lett's time estimate under hypnosis in order to make a reliable comparison of that estimate with those given by another neighbor. We conclude that Lett's testimony as to his pre-hypnotic recall was properly received.
*311 Our determination as to this issue squares with the great majority of decisions elsewhere which have considered the question.
In a recent annotation it is stated that many courts, even those holding hypnotically enhanced testimony otherwise inadmissible, have ruled that a witness may testify as to matters "demonstrably recalled and related" before he was hypnotized. Annotation, Admissibility of Hypnotically Refreshed or Enhanced Testimony, 77 A.L.R. 4th 927, 940 (1990). Courts have generally required, as a prerequisite to the admission of such testimony, that the witness's pre-hypnotic recollections be recorded in written or taped form, such that the extent and particulars of the recall may be sufficiently established. Id. Some courts have also explored the following additional factors: the degree to which the witness had confidence in his initial recollection before he was hypnotized, the extent of the witness's belief in the ability of hypnosis to yield the truth, the nature of questioning employed, and any other factor relevant to determining whether hypnosis so enhanced the witness's confidence in his original recollection as to substantially impair the opposing party's right to cross-examination. Id.
According to the New York courts, the "emerging consensus" is that events recalled after hypnosis are inadmissible per se but that the witness can still testify to events recalled prior to hypnosis. People v. Hughes, 59 N.Y.2d 523, 453 N.E.2d 484, 492, 466 N.Y.S.2d 255, 263 (1983). This line of authority permits pre-hypnotic recollection even though it is far more restrictive as to post-hypnotic recall than in New Jersey where such evidence is admitted subject only to the Hurd guidelines. See State v. Hurd, 86 N.J. at 545-46, 432 A.2d 86.
According to the Hughes court, the most extreme view is that a hypnotized witness is contaminated and incompetent to testify, even as to pre-hypnotic events  a view that, at the time of the Hughes opinion, was followed only in California. Hughes, supra, 453 N.E.2d at 492, 466 N.Y.S.2d at 263 (citing People v. *312 Shirley, 31 Cal.3d 18, 723 P.2d 1354, 181 Cal. Rptr. 243 (1982), cert. denied, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982)). Indeed, in Shirley the California court had adopted the view of a leading expert in the field and had ruled inadmissible the testimony of any witness who had undergone hypnosis for the purpose of restoring his memory of certain events. Such testimony was deemed inadmissible as to all matters relating to those events. Shirley, supra, 723 P.2d at 1384, 181 Cal. Rptr. at 273. This holding in Shirley had become the "premier opinion" discussing the inherent unreliability of such testimony, although some courts called it a "draconian" ruling which was unnecessarily overinclusive. Stokes v. State, 548 So.2d 188, 193-94 (Fla. 1989). As will be seen infra, the Shirley ruling has been subsequently limited in its scope.
Under the New York approach, it is recognized that a major difficulty arises because a hypnotized witness acquires increased confidence in his recollections which could then inhibit a defendant's right of cross-examination. This difficulty warrants a pretrial inquiry and a resolution of two particular issues: (1) the extent of the witness's pre-hypnotic recall; and (2) the degree to which the hypnosis itself was so "impermissibly suggestive as to require exclusion of in-court testimony with respect to prehypnotic recollection." Hughes, supra, 453 N.E.2d at 496, 466 N.Y.S.2d at 267.
With respect to the first prong, any evidence, testimonial and documentary, which is material to the determination should be received at the pretrial hearing. With respect to the second prong, the general standards and guidelines proposed by experts with regard to hypnosis should be used as a basis for assessing suggestibility. Id.; see People v. Tunstall, 63 N.Y.2d 1, 468 N.E.2d 30, 34, 479 N.Y.S.2d 192, 196 (1984) (further refining these standards).
The Hughes court further noted that a rough analogy could be drawn between the taint of a witness who has been exposed to an impermissibly suggestive hypnotic session and the taint of *313 one who has been exposed to an impermissibly suggestive out-of-court identification procedure. In the case of identification testimony, an in-court identification of the accused is allowed where the State can show a sufficient independent source for such testimony and that the witness's recollection springs, not from the suggestive procedure, but from his or her own opportunity to view the accused at the time of the crime. Hughes, supra, 453 N.E.2d at 496 n. 41, 466 N.Y.S.2d at 267 n. 41; see State v. Haislip, 237 Kan. 461, 701 P.2d 909, 926 (1985), cert. denied, 474 U.S. 1022, 106 S.Ct. 575, 88 L.Ed.2d 558 (1985) (drawing the same analogy). In our view, the analogy is valid.
The New York approach has been adopted, with minor variations, in numerous other states  even in those states expressly declaring post-hypnotic testimony inadmissible per se. See, e.g., Contreras v. State, 718 P.2d 129, 139-140 (Alaska 1986) (witness may testify as to facts related before hypnosis as long as such information is adequately preserved); State ex rel. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266, 1295 (1982) (witness may testify with regard to those matters he was able to "recall and relate" prior to hypnosis, as long as the hypnotic procedure itself is designed to minimize the danger of contamination); Elliotte v. State, 515 A.2d 677, 680-681 (Del. 1986) (pre-hypnotic recall is admissible as long as the two-pronged Hughes/Tunstall inquiry is made); Stokes v. State, supra, 548 So.2d at 196 (witness may testify to statements made before hypnosis if "properly recorded"); State v. Moreno, 68 Haw. 233, 709 P.2d 103, 105 and n. 3 (1985) (witness may testify as to matters recalled prior to hypnosis, even though separating the "wheat" of prior recall from the "chaff" of hypnotically induced recollection may be difficult); State v. Bainbridge, 117 Idaho 245, 787 P.2d 231, 239-240 (1990) (witness must testify from "present recollection" of those matters recalled prior to hypnosis; the recording of his pre-hypnotic statements is required to verify that he has not been tainted by the hypnosis); People v. Zayas, 131 Ill.2d 284, 137 Ill.Dec. 568, 574, 546 N.E.2d 513, 519 (1989) (proponent must establish that *314 the testimony of a previously hypnotized witness is based solely on that witness's independent pre-hypnotic recall); State v. Seager, 341 N.W.2d 420, 431-432 (Iowa 1983) (State should be given opportunity to demonstrate that witness's testimony would be substantially the same as that provided in statements to the police prior to being hypnotized); State v. Haislip, supra, 701 P.2d at 925 (facts recalled and related before hypnosis are admissible; adopting the Hughes two-pronged approach); State v. Collins, 296 Md. 670, 464 A.2d 1028, 1044 (1983) (witness can testify in accordance with statements clearly demonstrated to have been made prior to hypnosis); Commonwealth v. Kater, 388 Mass. 519, 447 N.E.2d 1190, 1197-1198 (1983) (witness's testimony as to his pre-hypnotic memory should not be inadmissible in all events; record of such memory should be preserved and certain procedures should be followed, but not inflexibly applied); State v. Koehler, 312 N.W.2d 108, 110 (Minn. 1981) (witness may testify as to matters which were "previously and unequivocally disclosed" to authorities before hypnosis); State v. Patterson, 213 Neb. 686, 331 N.W.2d 500, 504 (1983) (witness permitted to testify with regard to those matters he was able to "recall and relate" before hypnosis); State v. Peoples, 311 N.C. 515, 319 S.E.2d 177, 188 (1984) (hypnotized witness may testify as to facts which he related before the hypnotic session as long as such information is preserved); State v. Johnston, 39 Ohio St.3d 48, 529 N.E.2d 898, 903 and n. 4 (1988), reh'g denied, 40 Ohio St.3d 707, 534 N.E.2d 850 (1988) (testimony supplied by witness regarding events recalled and related prior to and independent of hypnosis is admissible); Robison v. State, 677 P.2d 1080, 1085 (Okla. Crim. App. 1984), cert. denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) (facts "demonstrably recalled" prior to hypnosis are admissible); Commonwealth v. Smoyer, 505 Pa. 83, 476 A.2d 1304, 1308 (1984) (pre-hypnotic recall is admissible if proponent shows testimony was established and existed prior to any hypnotic process); State v. Tuttle, 780 P.2d 1203, 1211 (Utah 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 1323, 108 *315 L.Ed.2d 498 (1990) (previously hypnotized witness may testify but his testimony should be limited to his pre-hypnotic recall as it has been recorded before hypnosis); State v. Martin, 101 Wash.2d 713, 684 P.2d 651, 656-657 and n. 2 (1984) (hypnotized witness may testify as to facts recalled before hypnosis as long as detailed record of pre-hypnotic memory is preserved).
We note that California, the state which had long led the field in the wholesale rejection of hypnotically induced testimony, recently decided to align itself with this "nearly unanimous body of sister-state decisions," and now holds that a witness who has undergone hypnosis is not barred from testifying to events which the court finds were "recalled and related" prior to the hypnotic session. People v. Hayes, 49 Cal.3d 1260, 783 P.2d 719, 725-727, 265 Cal. Rptr. 132, 139-141 (1989). This alignment came notwithstanding the court's reaffirmation of the Shirley rule with respect to post-hypnotic testimony. Hayes, supra, 783 P.2d at 724-725, 265 Cal. Rptr. at 138-139.

The State's Violation of Discovery Obligations
According to pretrial discovery furnished by the State, the medical examiner was expected to testify that the distribution of the victim's lividity was "consistent with the position in which the body [was] found." "Lividity" on a dead body is a pinkish blush which begins to appear within a half hour after death as the red blood cells settle to the dependent parts. When he testified, however, the medical examiner stated there was also a secondary line of lividity on the body which confirmed the State's theory that the body had been moved approximately one hour after death.
Defendant contends, as he did at trial, that the testimony concerning the secondary line of lividity should not have been received because of the State's failure to furnish this information to defendant prior to trial. It is clear to us that the State's failure to meet this obligation was inexcusable and deserves admonishment. Defendant insists that this information, which *316 was not made known until after Seifrit testified, would have been useful to him in cross-examining Seifrit. However, we are unable to understand what value it could possibly have had. Furthermore, after the medical examiner completed his testimony it was necessary to recess the trial for a period of one week because of a death in the family of one of the jurors, so that defendant had ample time to study this development in the testimony and the evidence on which it was based. It is also clear that following such study defendant could have recalled the medical examiner and Seifrit for further cross-examination. However, no request for the recall of either of these witnesses was made.
Further discussion of this issue is unnecessary for the reason that on the retrial, which we mandate for reasons to be stated, defendant will now be fully informed and prepared to deal with all the forensic proofs to be offered by the State.

Admission of Decedent's Hearsay
In presenting its main case the State called to the stand Jane Peltier and Diane Wells, friends of Gail Dreher. They testified that during the few months before her death Gail told them that her marriage was in very bad condition, that she was considering leaving defendant, and, as stated by Peltier, "that she wanted to get a divorce." In response to defendant's objection the State argued that the testimony was admissible to show defendant's motive to commit the murder. In a supporting memorandum it categorically stated that defendant's "discovery of [Gail's plan to leave defendant] was his motive for killing her." It further stated:
[T]he State is offering Ms. Peltier's testimony for the precise purpose of showing Gail's plan to leave her husband in the immediate future and because this plan to leave was the catalyst that caused defendant to kill her when he did....
The court pointed out that the State was proposing to do what State v. Machado, 111 N.J. 480, 545 A.2d 174 (1988), "says precisely you cannot do." It was then that the State altered its *317 position to argue that it should properly be allowed to show the relationship between defendant and Gail as part of the "mosaic" against which the killing must be judged. Thereupon, the court admitted the challenged testimony with the following statement:
Clearly, this is offered, after my conversation here with ... [the prosecutor], it's being offered to set forth the state of mind, statements of state of mind of the declarant relating to her potential actions and nothing more.
We have no doubt that the purpose of having Peltier and Wells recount Gail's hearsay statements was to show why defendant was motivated to take Gail's life. Indeed, in summation the prosecutor said so: "Motive, the motive for killing his wife. The motive, a bad marriage. You save yourself a costly divorce. The motive." (emphasis added). That the jury would not overlook this evidence was insured when it was instructed by the court in the following language:
The State, however, is not required to prove a motive. If the State has proved the essential elements of the offense beyond a reasonable doubt, the defendant must be found guilty of that offense, regardless of defendant's motive or lack of motive. If the State, however, has proved a motive, you may, of course, consider that insofar as it gives meaning to other circumstances. On the other hand, the absence of motive may be considered in weighing whether or not the defendant participated in the crime charged.
See State v. Carter, 91 N.J. 86, 102-103, 449 A.2d 1280 (1982).
It is settled that a decedent's hearsay statements are not admissible to prove the defendant's motivation or conduct, and convictions have been reversed where such statements were admitted. State v. Machado, supra; State v. Prudden, 212 N.J. Super. 608, 515 A.2d 1260 (App.Div. 1986); State v. Downey, 206 N.J. Super. 382, 502 A.2d 1171 (App.Div. 1986). The decedent's hearsay statements in those cases were contained in a letter left by the deceased victim in which defendant was named as the victim's likely killer. In State v. Downey, 206 N.J. Super. at 392-93, 502 A.2d 1171, we noted three well-defined exceptions in which a victim's hearsay statement concerning his state of mind have been admitted. These apply (1) where defendant asserts a claim of self-defense as justification for killing, (2) where defendant seeks to defend upon a claim *318 that the deceased committed suicide and (3) where defendant asserts that decedent died as the result of an accident. 206 N.J. Super. at 392-93, 502 A.2d 1171. As we stated at 391, 502 A.2d 1171, "The rule is limited to statements offered to prove the declarant's conduct, not that of another person." Even more to the point is the following statement in State v. Machado, 111 N.J. at 489, 545 A.2d 174: "Declarations of the victim's state of mind, however, should not be used to prove the defendant's motivation or conduct."
The hearsay statements here considered are of two distinct characters, and in determining whether their admission was error they must be separately considered. We conclude that those statements made by the decedent which generally describe the foundering state of the marriage are "admissible as background to establish the nature of the relationship between the victim and the defendant." State v. Machado, 111 N.J. at 489, 545 A.2d 174. That the marriage was an unhappy one seems not to be disputed, and the prosecutor was entitled to head off any attempt by defendant to argue that the State had failed to show that relations between husband and wife were not so harmonious as to be inconsistent with the commission of a homicide by one upon the other.
Gail's statements concerning her intent to leave defendant and obtain a divorce, however, fall into a completely different category. As the State argued from the outset, its only purpose in offering proof of those hearsay statements was the impermissible one of demonstrating a motive for the murder. Its prejudicial impact cannot be underestimated. Had that evidence been excluded, all that the State would have been able to urge as a reason for the killing was the fact that defendant was mired in an unhappy marriage. Nothing in the evidence suggests that he committed the crime in order to marry Seifrit. It does not even appear that the subject of marriage was ever discussed between them. Thus, from all appearances, although this was not a healthy marriage, defendant *319 had his home, his family, his affluence and the luxury of a mistress. Within such a context it is entirely conceivable that a jury would be unable to discern a plausible reason why he would heartlessly slaughter the woman with whom, during their 15-year marriage, he had slept and eaten and raised two sons. But the introduction of evidence that Gail planned to leave defendant transformed this ambiguous picture into one of perfect clarity. Revealed by Jane Peltier's testimony is the familiar, universally understood scenario for murder. It could not have been put more tellingly than it was by the prosecutor when he declared to the jury that by killing his wife defendant would save himself "a costly divorce." The argument was made without a shred of competent proof that Gail had taken any concrete steps to dissolve the marriage or, more importantly, that defendant even suspected her intention to do so.
The admission of the hearsay evidence and its utilization by the State constituted error.

The State's Use of Peter Dreher's Out-of-Court Statement
On January 12, 1986, ten days after the killing, officers from the Chatham Police Department and the Morris County Prosecutor's Office interviewed Peter Dreher, the defendant's younger son, who was then 12 years old. During the interview Peter was shown the length of string used to strangle his mother. Although Peter did not give a written statement at that time, the police investigation report of the interview stated: "Peter indicated that maybe it was the type his dad used to tie up newspapers, and that it might be kept in his dad's desk which is in the first floor den." (Emphasis added.)
When Peter was called as a witness by the State he was presented with the same string and asked whether he had ever seen it in the den or in his father's desk. When he replied that he had not, the following exchange of questions and answers occurred:
Q. Had you ever seen string like that used to tie up newspaper?

*320 A. It's not biodegradable so it wouldn't really be good, no.
Q. Do you recall indicating that maybe this was the type that was kept in the desk in the den?
A. Yes.
Q. And you recall indicating that maybe this was the type that was used to tie up newspaper?
A. Yes.
Peter's foregoing testimony provided no competent evidence to connect the string used to kill Gail Dreher with defendant's desk in the den. Nevertheless, the State argued in summation that the string used to tie Gail came from defendant's desk. Defendant's objection was overruled on the court's determination that the "jury's recollection will govern." The prosecutor then continued with his summation and made the following statement to the jury:
Peter Dreher has said that that string is what his father keeps in the desk of the den, that type of string, tied up.
The statement that defendant had taken the string from his desk was repeated by the prosecutor later in his summation. The State's argument had no support in the evidence and was prejudicial. Its only basis was Peter's out-of-court oral statement which was inadmissible hearsay. Furthermore, even if it were admissible, it furnished no support for the prosecutor's statement that Peter "said that that string is what his father keeps in the desk of the den." Peter never testified to this and all that he was recorded as saying out of court was that "maybe" it was the type defendant used to tie up newspapers and that it "might" be kept in defendant's desk. In his testimony Peter denied that the string used in the killing was the same as that which defendant kept in his desk, and the prosecutor's argument was actually contrary to the evidence.
Although in other settings we have left the witness's testimony to the recollection of the jury, in this case the evidence of record is too susceptible of misinterpretation to allow for this as a workable disposition. The prosecutor's reference to Peter's statement that the string "is what his father keeps in the desk of the den" could well have found acceptance in the minds of *321 the jurors based on confusion in the way they recalled and understood what Peter stated out of court to the police. Without substantial assurance in the record that the jurors were alert to the highly equivocal nature of the out-of-court statement and the important evidential distinction between hearsay statements and in-court testimony, we cannot indulge in the sanguine assumption that they were not misled by the prosecutor into believing that Peter had testified to something other than what he did.
The significance of allowing the prosecutor to claim that the string came from defendant's desk is that this "murder weapon" thereby became distinctively identified with defendant. As the prosecutor argued, because the string came from defendant's home, the murderer could only have been someone who knew where it could be found and could put his hands on it quickly and easily when needed  obviously, the defendant. The likelihood that it would be used by an intruder who was a stranger to the house, the hypothesis tendered by defendant, seems too remote to be seriously considered.

Harmless Error?
The State argues that the admission of Gail's hearsay statement and the use made of Peter Dreher's distorted hearsay statement as substantive evidence constitute at most harmless error. We disagree. In the last analysis the State's case was vitally dependent upon the testimony of Nancy Seifrit, an admitted accomplice who testified against defendant only after receiving a grant of immunity. While the jury was free to accept, as it did, the truth of her testimony, it is necessary to discuss the reasons for our serious concern as to whether her credibility would have been accepted by the jury absent the illegally received evidence.
Implying that it was Seifrit herself, either alone or assisted by an unknown person, who committed the murder, the defense demonstrated through three-and-a-half days of cross-examination, *322 that she was a person who, throughout her life and throughout these proceedings has displayed nothing but boundless contempt and indifference to the truth. Her disposition to lie about matters such as her personal background, her employment, her social security numbers, her age and name was shown to have been indulged as a way of life over a long period of time. Ostensibly, she did so to evade creditors, law enforcement officials and regulatory agencies. She lied about her ability to fly a plane, the status of her driver's license and the level of her formal education. She admitted that she lied whenever it served her interests, and that it was possible she told so many lies about herself over so long a time that she no longer knew what was the truth and what was a lie.
On cross-examination, Seifrit was forced to admit that she had repeatedly lied in her several appearances before the grand juries that were investigating the murder and that she had lied in parts of her trial testimony. Some of her testimony and mendacious conduct could well be understood as calculated to divert suspicion from herself as the person solely responsible for the homicide. Some examples are appropriate. In her trial testimony she stated that when she arrived at defendant's house on the early morning of the crime she pulled into the driveway and parked her car "right by the garage." However, when she testified before a grand jury she stated that she "pulled into the garage." The difference is not without significance. The Dreher family owned two cars and the garage was built to accommodate two cars. If Seifrit pulled "into the garage" it would be at least inferable from the fact of a half-empty garage that defendant had already left for work and was not in the house when Seifrit arrived.
At the time of the killing Seifrit weighed 186 pounds, approximately 40 to 50 pounds more than the decedent. During the months following the murder she visited a doctor in New York for assistance in losing weight. Using an incorrect social security number and wearing an Eastern Airlines flight attendant's jacket, she falsely stated to the doctor that she was a *323 flight attendant employed by Eastern Airlines and needed to lose weight in order to satisfy job requirements. The implication strongly suggested by this covert episode is an intent on her part to discourage suspicion that she was physically capable of overpowering Gail and committing murder.
In determining whether the errors were harmless it is also relevant to question closely Seifrit's account of the morning's events in terms of common experience with human behavior. Although Seifrit stated that defendant wanted her to come to his house at 7:30 that morning in order to introduce her to Gail as the "other woman" and to "settle things," if her entire testimony is to be believed it was his real purpose to have her witness a murder. We find that proposition inherently dubious.
Although Seifrit said she arrived at the house at 7:30, this is the very same time that the Dreher sons, Peter and David, left for school that morning. They testified there had been no arguments or tension between their parents. Yet, according to Seifrit, it must have been within minutes of their departure that defendant flew into a homicidal fury. While the veracity of Seifrit's account was for the jury to determine, the probability of such behavior on the part of the defendant and the timing of the events are sufficiently questionable so as to have a place in a harmless error analysis.
Relevant also, is the State's reliance upon its contention that defendant drove from his office in Newark to his Chatham home and back between 9:00 a.m. and 10:00 a.m. that morning. Again, while the question was properly left to jury resolution, it was an extremely close one and is also fairly to be considered in determining whether the trial errors were harmless.
Finally, we come to the testimony of defense witness Kenneth Lussier. Lussier testified on behalf of defendant that in July 1987 he and Seifrit were engaged in a business transaction in North Carolina together with Seifrit's business partner, David Silverman. During an afternoon of heavy drinking around Lussier's swimming pool, Seifrit stated that Silverman deserves to be killed. When Lussier expressed his surprise at *324 this statement, Seifrit stated: "It can be done." She then related that she had "killed a lady in New Jersey" and was "getting away with it." According to Lussier, she added that she had been given immunity from prosecution and that she was a witness for the State against a man who "didn't do it." On cross-examination Seifrit denied making such statements, but no explanation was offered as to why Lussier should falsely testify as he did.
Errors or omissions must be disregarded by an appellate court unless they are "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. The test to be applied is whether the possibility of injustice is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). In our view, the proofs in this case were not "overwhelming." Cf. State v. Tirone, 64 N.J. 222, 227, 314 A.2d 601 (1974); State v. Wade, 116 N.J. Super. 449, 459, 282 A.2d 763 (App.Div. 1971); State v. Boiardo, 111 N.J. Super. 219, 233, 268 A.2d 55 (App.Div.), certif. denied, 57 N.J. 130, 270 A.2d 33 (1970).
After the most careful consideration we have a reasonable doubt as to whether the errors herein contributed to the verdict. We are therefore constrained to reverse the judgment of conviction and remand the matter for a new trial. In doing so, we emphasize that in reviewing the proofs and in resolving this appeal as we have we have no intent to substitute our judgment for that of the jury or to suggest what the proper outcome of a retrial should be. We merely decide that within the setting of all the evidence the errors committed were clearly capable of expunging from the mind of the jury its last remaining reasonable doubt as to the defendant's guilt.

Preclusion of Hearsay Testimony on Redirect Examination of Kenneth Lussier
We noted above that defense witness Kenneth Lussier testified to an admission by Seifrit that she alone killed a *325 woman in New Jersey and that the man accused of the crime "didn't do it." On cross-examination, the State confronted him with the fact that when first questioned by the defense investigators Lussier had not related what Seifrit had allegedly said to him. He was allowed to explain on further cross-examination and redirect that he did not furnish this information at the initial interview because he was then burdened with extremely difficult business problems and that rather than get "involved" he told the investigators to speak with Laurie Morris. Morris was a friend of Seifrit who he believed could be of assistance to the investigators. The investigators did interview her, but it appears that she died prior to the trial and her testimony was therefore unavailable. Defendant's attempts to have Lussier testify to what Morris would have said were barred by the court. Had that testimony been permitted, Lussier would have said that in a telephone conversation he had with her she told him that during a trip she had taken with Seifrit, Seifrit told her "she killed a lady up in New Jersey." Defendant appeals from that ruling.
Evidence of a statement offered to prove the truth of the matter stated, which is made other than by a witness while testifying at trial, is hearsay and "is inadmissible except as provided in Rules 63(1) through 63(33)." Evid.R. 63. Although defendant claims that the excluded out-of-court statement by Morris should have been allowed in order to rehabilitate Lussier, he does not suggest that the statement would not have been used to prove the truth of the matter stated. Although defendant wanted to rehabilitate the witness, he also wanted a jury to hear that Seifrit confessed to her crime on not one, but on two separate occasions to two different people.
To support his argument that hearsay is permitted to rehabilitate the credibility of a witness, defendant relies on State v. Mulero, 51 N.J. 224, 238 A.2d 682 (1968). That reliance is misplaced. In Mulero, the State was permitted on redirect to have its witness (the mother of the murdered victim) explain that she had never before complained to the police about other *326 beatings that the defendant (her paramour) had given the victim because she was afraid of the defendant since he had previously beaten her as well. Our Supreme Court noted that such an explanation was proper where the defense, on cross-examination, sought to capitalize on the witness's silence. Id. at 227, 238 A.2d 682. However, that case did not involve the use of inadmissible hearsay.
To the extent that defendant contends that he needed this testimony to offset the damage done to his witness on cross-examination, the trial court did allow considerable leeway. The witness was allowed to say that he remained silent when first questioned by defense investigators because he referred them to another person who had more information. Further, Lussier was permitted to offer an even more plausible explanation for his silence. A resident of North Carolina, he was loath to be drawn into this matter, either on behalf of the prosecutor or the defense. His energies at that time were focused on establishing a business and his considerable financial difficulties were keeping him very much preoccupied. We find no error in the court's ruling.
Finally, defendant complains of error in the court's charge to the jury and in the wording of the indictment. These issues were not properly raised below and are therefore not appropriate for appellate review. Defendant will have an opportunity to raise them upon the remanded proceedings.
In view of our disposition herein it is unnecessary for us to consider defendant's claims of jury irregularities.
Reversed and remanded for a new trial.
NOTES
[1] Obviously, if defendant had actually concluded his telephone conversation from the office at 8:59 a.m., it would have been practically impossible for him to have been seen leaving his home at 9:15 a.m.
[2] Dr. Orne testified only as to the dangers of hypnotically induced recollection at the Hurd hearing. He was not called to testify during the trial.