Filed 9/11/23

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096437 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE004429) |
| v. | |
| CURTIS ANTHONY SLATON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Maryanne G. Gilliard, Judge. Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and II of the Discussion.

1

A jury found defendant Curtis Anthony Slaton guilty of murder. The prosecution's theory in the case was that defendant committed the murder because he affiliated with a gang that wore blue and the victim wore red—a color associated with a rival gang. The trial court allowed the prosecution to present limited gang evidence to advance this theory, including screenshots from a music video that, among other things, show defendant affiliating with a known gang member, displaying a symbol of the gang, and holding up a blue bandana.

On appeal, defendant contends the trial court wrongly admitted these screenshots for three reasons. First, he argues this evidence was inadmissible to show his potential motive for the charged murder. He appears to reason that the screenshots might have been admissible to show motive if having gang ties were a crime, but because it is not, the screenshots should have been excluded. Second, he asserts the screenshots should have been excluded because they were highly inflammatory and carried minimal relevance. And third, he contends a new statute governing the admission of music videos and other forms of creative expression—which became effective after the trial here—applies retroactively and requires reversal. We affirm, finding none of these arguments persuasive.

BACKGROUND

I

*Factual Background*

On October 3, 2020, Jaylen Betschart called a friend and said a car was following him in Sacramento. Surveillance video from that time shows a gray Dodge Avenger passing Betschart's car and then, a little later, driving behind Betschart. Two witnesses heard gunshots shortly after around 3:30 p.m. One witness saw a car veer off the road and hit a telephone pole. The driver, Betschart, was slumped against the steering wheel and not moving. Another witness saw a white car drive through an intersection and then a gray Dodge approach the same intersection. The driver of the Dodge retracted his arm

2

while looking in the direction of the white car and then drove away. Betschart died from a gunshot wound that entered his back, passed through his left lung and heart, and exited through his chest. He had just turned 17.

Officers investigating the shooting were led to defendant's home, where the gray Dodge shown in the surveillance video was registered. They found two cars at the home—the Dodge and a Buick. After being asked about the Dodge, defendant told an officer that he was the car's primary driver and no one else drove it. But he denied any involvement in the shooting and denied having any guns at his home. After obtaining a search warrant, law enforcement searched the two cars, checked the Dodge for gunshot residue, and analyzed two bullet cartridges collected from the scene of the shooting. In the Buick, officers found a Glock 22 .40-caliber handgun under the rear passenger seat and a utility bill in defendant's name. In the Dodge, a gunshot residue expert found a relatively high concentration of gunshot residue, with most on the driver's side of the car. And a ballistics expert concluded that the bullet cartridges from the shooting were fired from the gun found in the Buick.

Officers reviewed cell phone location data for defendant and one of his stepchildren, D.C. At 3:29 and 3:30 p.m. on October 3, 2020, D.C.'s phone was near the intersection where witnesses heard gunshots. Defendant's phone was not communicating with cell towers at this time (or at any time between 3:22 and 3:55 p.m.), as could happen if his phone were off. But at 3:21 p.m. and again at 3:55 p.m., defendant's and D.C.'s phones were in the same general area.

Officers also reviewed videos on D.C.'s social media and pictures on his phone. A video taken at 3:21 p.m. on October 3, 2020, shows D.C. in the passenger seat of defendant's Dodge. D.C. appears to have a Glock pistol in his lap. A second video taken nine minutes later films the road and shows the Dodge driving behind Betschart's car. In the video, D.C. says: "Sucka's spooked nigga on Grego. Nigga. Sucka's runnin'. All behind him. Dead homie. . . ." According to a witness familiar with these terms,

3

"Sucka" is a derogatory term for the opposing side or someone you do not respect and "Grego" was a gang member who was shot and killed in September 2017. A picture taken at 4:00 p.m. on October 3, 2020, shows D.C. wearing a yellow sweatshirt and holding a pistol of the type used in Betschart's murder. Another picture shows an October 3, 2020 news story concerning a shooting at Mama Marks Park in Sacramento that left three wounded and a nine-year-old girl dead.

Surveillance video from around the time of Betschart's murder shows defendant's Dodge with a driver and a passenger inside. The passenger is wearing a yellow top, consistent with the yellow sweatshirt that D.C. wore the day of the murder. The driver appears to be a Black male in a white shirt with a very heavy build. Defendant is a Black male with a heavy build. Records from the Department of Motor Vehicles list him as five foot seven and weighing 280 pounds.

Officers reviewed defendant's Facebook account and, starting in March 2021, listened to his calls after obtaining a wiretap. About nine hours after Betschart's murder, a Facebook friend of defendant's posted a photograph of the girl murdered at Mama Marks Park. Defendant messaged the friend, saying, "I know. I'm be on a killing spree." A few days after officers obtained the wiretap, officers recorded a call defendant had with his sister, Kasey Potter. Defendant and Potter talked a little over an hour after an officer went to Potter's house and asked about defendant. Potter told defendant the police were looking for him and said she told them she did not know his whereabouts. Potter added that "[t]hey can't pin point who is in the car" and instructed defendant, "[K]eep your mouth shut. Keep your mother fucking mouth shut . . . ." Defendant responded, "On mammas" or "On mamas." Potter further instructed defendant, "[I]f they speak to you, you don't know nothing . . . and if they ask you don't know what they are talking about." Defendant said, "Yep."

Law enforcement eventually suspected gang ties in Betschart's murder. The lead investigator in the case was familiar with various gangs operating in South Sacramento,

4

including G Parkway Mobb (or G-Mobb), Starz Up, Guttah Gass Team (or Guttah, which might have begun as the Guttah Boys), Garden Blocc Crips, 29th Street Crips, 24th Street Crips, and Oak Park Bloods. He understood that the names for the three local Crips gangs "are very interchangeable"; that the making of a "C" with a hand can stand for the Crips; that the main rival for G-Mobb, Starz Up, and the Crips is the Oak Park Bloods; and that blue is associated with the Crips and red is associated with the Oak Park Bloods. On the day of the shooting in this case, Betschart was wearing a red shirt.

Officers found both defendant's and D.C.'s social media accounts suggested a connection to one of the South Sacramento gangs. D.C.'s Instagram account name included the initials "GGT," which is an abbreviation for Guttah Gass Team. His account listed the nicknames of several gang members who had been killed in Sacramento— including a 29th Street Crip and Grego, a Starz Up and Guttah gang member—and said, "Rest up soldiers." Defendant's social media—in which he is referred to as "Garden Boy"—included a picture showing him wearing a blue bandana and making a "C" with his hand. It also included a tribute to a 29th Street Crip who had been killed. A month before Betschart's murder, defendant posted a rap video on his social media. One man in the video has a tattoo that says "Crip" and another is a known member of the Garden Blocc Crips. Several people in the video wear blue clothing or have blue bandanas. And defendant has a blue bandana and, in one of the scenes, makes a "C" with both his hands.

On October 23, 2020, while defendant and D.C. were both in detention facilities, the two spoke over the phone. Defendant told D.C., "I gotta write a song about you. How . . . me and you came up in this bitch. Me and you run South Sac Iraq." After D.C. laughed, defendant continued, "PB and his son don't, Lav and his son don't, me and you do." The lead investigator for Betschart's murder understood "South Sac Iraq" to refer to the shootings in South Sacramento; "PB and his son" to refer to a 29th Street Crip and his son, a Guttah gang member; and "Lav and his son" to refer to a Starz Up gang member

5

and his son, a Guttah Boy gang member. Per stipulations in this case, neither defendant nor Betschart were gang members.

II

*Procedural Background*

Defendant was charged with Betschart's murder. (Pen. Code, § 187, subd. (a).) The charging document alleged a firearm enhancement because defendant intentionally discharged a firearm causing Betschart's death (*id.*, § 12022.53, subd. (d)) and a special circumstance for the murder because defendant intentionally committed the murder by discharging a firearm from a motor vehicle at a person outside the vehicle (*id.*, § 190.2, subd. (a)(21)). It also alleged that defendant had a prior strike. (*Id.*, §§ 667, subds. (b)-(i), 1170.12.)

Before trial, the prosecution asked the trial court to allow expert testimony about the gang rivalries in Sacramento and defendant's and D.C.'s gang affiliations. It argued this evidence was necessary for the jury to understand defendant's motive and intent, explaining that although Betschart was not affiliated with the Oak Park Bloods, he was wearing red on the day he was murdered. During the arguments on motions in limine, the prosecution further suggested that the Mama Marks Park shooting—which it described as another gang shooting—drove defendant to seek retribution.

Over defendant's objection, the trial court allowed the prosecution to introduce some gang evidence. It reasoned that this evidence would provide an explanation for why Betschart was murdered: He was targeted because he wore a red shirt and defendant, although not shown to be a gang member, had affiliated with a gang that wore blue. The court added that the jurors were entitled to know the meaning of several terms—including South Sac Iraq, Sucka, and Grego—that they would hear. The court emphasized, however, that it intended "to severely limit gang information this jury is going to hear."

6

During trial, the prosecution offered a witness explaining these terms and introduced 13 screenshots from defendant's rap video. A witness explained the relevance of these screenshots. One shows a man with a back tattoo that says "Crip." Another shows a sign for 29th Street, which is in the South Sacramento neighborhood associated with the 29th Street Crips or Garden Blocc Crips. A third image shows the intersection of 29th Street with another street. A fourth image shows a man who is making a "C" with his hand and wearing blue clothes and a blue bandana, which suggests association with the Crips. A fifth image shows defendant displaying a "C" with both his hands. A sixth image shows defendant and others holding up blue bandanas, which are commonly associated with the 29th Street Crips or Garden Blocc Crips. A seventh image shows defendant in what appears to be a convenience store. In the video of the depicted scene, according to the witness, defendant made a motion with his hand consistent with firing a pistol. Three images show a known Garden Blocc Crip gang member, with D.C. and defendant present in two of these images. Two other images show D.C. and others, with one of D.C.'s siblings shown in one of the images. And a final image shows defendant standing in front of the camera. Apart from discussing these images, the witness also acknowledged a line in the rap video in which defendant refers to taking his "pole"— meaning, his gun—whenever he leaves home. The jury never heard the rap video.

The jury found defendant guilty as charged and found the special circumstance and the firearm allegation true. The court later found the strike allegation true and sentenced defendant to life without the possibility of parole for murder, plus a 25-year-to-life sentence for the firearm enhancement. Defendant timely appealed.

DISCUSSION

I

*Section 1101*

We start with defendant's contention that the screenshots from the music video were inadmissible to show his potential motive for the charged murder.

7

Defendant's argument concerns the admission of evidence under Evidence Code section 1101.[1]  Section 1101, subdivision (a) limits the admissibility of character evidence offered to prove a person's conduct on a particular occasion.  It provides that, in general, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (§ 1101, subd. (a).)  Section 1101, subdivision (b), however, "clarifies the scope of subdivision (a)."  (*People v. Guzman* (2019) 8 Cal.5th 673, 689.)  It allows the "admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive . . .) other than his or her disposition to commit such an act."  (§ 1101, subd. (b).)

In this case, as covered above, the trial court admitted the screenshots on the ground that they were relevant to show defendant's motive for shooting Betschart: Betschart wore red—the color of the Oak Park Bloods—and defendant affiliated with a rival gang that wore blue.  But in defendant's telling, that was improper because section 1101, subdivision (b) "only applies to a crime, civil wrong, or other bad acts and affiliating with a gang in a rap video is not a crime."

Defendant misreads the statute.  Section 1101, subdivision (b) is not limited to acts that are a crime, as defendant suggests.  Nor is it limited to evidence of "a crime, civil wrong or a bad act," as defendant elsewhere claims.  It instead, again, covers "a crime, civil wrong, *or other act* when relevant to prove some fact (such as motive . . .) other than [the person's] disposition to commit such an act."  (§ 1101, subd. (b), italics added.)  Defendant's acts depicted in the screenshots, including those evidencing his gang ties, can be considered "other act[s]" under this statute, even if, as defendant argues,

---

[1]  Undesignated statutory references are to the Evidence Code.

"affiliating with a gang in a rap video is not a crime." That follows not only from the statute's plain text, but also from decades-old precedent interpreting the statute. (*People v. James* (1976) 62 Cal.App.3d 399, 407 ["section 1101 of the Evidence Code is not confined to evidence of crimes"].)

## II

### *Section 352*

We turn next to defendant's assertion that admission of the screenshots was unduly prejudicial.

Under section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Reviewing courts will not disturb a trial court's admission of evidence " 'over an Evidence Code section 352 objection . . . unless the trial court's decision exceeds the bounds of reason.' " (*People v. Montes* (2014) 58 Cal.4th 809, 859.)

According to defendant, the trial court here should have excluded the video screenshots because they were irrelevant and highly prejudicial. He argues the screenshots were irrelevant "because this case was not a gang case, there was no gang enhancement charged and there was no evidence that [Betschart] was shot on orders from the Crips." And he argues the screenshots were highly prejudicial because gang evidence, as a general matter, is particularly inflammatory.

We reject his argument. Gang evidence, it is true, " 'may have a highly inflammatory impact on the jury.' " (*People v. Flores* (2020) 9 Cal.5th 371, 402 (*Flores*).) And "[t]he risk of injecting undue prejudice is particularly high in cases where the prosecution has not charged a gang enhancement and the probative value of the gang evidence is minimal." (*Ibid.*) But here, the evidence showing defendant's affiliation with the Crips was highly relevant to his possible motive for the charged murder. The

9

screenshots show defendant using his hands to make a sign (a "C") that stands for the Crips, show several people holding blue bandanas (with blue being the Crips' favored color), and show defendant affiliating with a known member of the Garden Blocc Crips. The screenshots also show a street sign for 29th Street—which is associated with the 29th Street Crips or Garden Blocc Crips—and a man with a back tattoo that says "Crip." An image on defendant's social media account further showed him wearing a blue bandana and again making a "C" with his hand. This evidence established (at the least) defendant's sympathies for the Crips. Other evidence then established that defendant could perceive Betschart as a rival to his favored gang. A gang expert explained that the local Crips' main rival, the Oak Park Bloods, wore red, and Betschart wore red on the day of his murder.

Under these circumstances, we find the screenshots showing defendant's affiliation with the Crips highly relevant—and indeed, central—to the prosecution's theory that defendant shot Betschart because he believed Betschart associated with a rival gang. We also find the trial court limited the risk of undue prejudice, allowing the prosecution to show the video screenshots but not play the video itself. Nothing in the screenshots, moreover, emphasized the violent nature of gang activity or suggested defendant's gang association predisposed him to violent crimes. This evidence, like any evidence of gang affiliation, was still prejudicial to a degree. But we find any prejudice resulting from this limited evidence was outweighed by its probative value. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [finding gang evidence properly admitted to show a defendant's motive and intent and stating that, "[i]n general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent" ' "]; *People v. Williams* (1997) 16 Cal.4th 153, 193-194 [finding a trial court did not abuse its discretion in admitting gang evidence relevant to the prosecution's theory that the defendant shot a victim because he dressed like those in a rival gang].)

10

None of defendant's arguments persuade us to find differently. He first objects that this case was not a gang case. But at least tangentially, it was. Again, defendant's gang affiliation (even if not gang membership) was central to the prosecution's theory of the case. Defendant also argues that no evidence showed that Betschart was shot on orders from the Crips. Although an order of that sort may have supported the prosecution's case, it was not necessary to demonstrate defendant's potential motive and antipathy toward a perceived rival to the Crips.

Defendant further notes that no gang enhancement was charged. But even when no gang enhancement is charged, trial courts still can admit gang evidence when its probative value is not substantially outweighed by its prejudicial effect. That was true, for instance, in *Flores*. The defendant there, like defendant, was charged with murder without any alleged gang enhancement. (*Flores, supra*, 9 Cal.5th at pp. 377, 402.) Even so, our Supreme Court concluded that the trial court did not abuse its discretion in admitting expert testimony on gangs, including testimony explaining "the significance of disrespect," "the concept of 'good murders,' " and "that the 'ultimate' discipline for 'rat[t]ing out another gang member' is death." (*Id.* at p. 402.) The court reasoned that this testimony "was highly relevant to defendant's possible motive for the charged crimes" and "far outweighed" any prejudice resulting from the testimony. (*Ibid.*) We find similarly here.

Defendant also cites our Supreme Court's decision in *People v. Gomez* (2018) 6 Cal.5th 243 as supportive authority for his position. It is not. The prosecution's theory there was that the defendant killed two others, who were allegedly not paying "taxes" owed a gang, to remove his name from the gang's list that marked him for assault or murder. (*Id.* at pp. 259-261, 282-283.) An expert provided testimony to advance this theory, but our Supreme Court found two parts of this testimony should have been excluded. The first part concerned the expert's efforts to establish that he had contacts with gang members in a jail. (*Id.* at p. 295.) In his testimony, the expert noted that gang

11

members committed every conceivable crime in the jail and that a small number caused most of the problems. (*Ibid.*) But the court found "[t]his evidence went well beyond its stated purpose of demonstrating that [the expert] had 'contact with gang members in the [county] jail,' which had already been established by [other testimony]." (*Ibid.*) The second part concerned the expert's discussion about where, when, and how the gang started and a certain movie that the expert said accurately depicted the gang's earlier years. (*Ibid.*) In finding this testimony improperly admitted, the court explained that it found no "apparent connection between the testimony regarding the early history of the [gang] and [the charged] murders several decades later." (*Ibid.*) None of this discussion, however, advances defendant's claim here. Unlike the irrelevant testimony in *Gomez*, the evidence here was clearly relevant to the prosecution's theory of motive.

Defendant further contends the decision in *People v. Coneal* (2019) 41 Cal.App.5th 951 favors his position. But we find that case undermines his position more than anything. The court there found the trial court abused its discretion in admitting five Taliban rap videos in which, among other things, "[g]ang members rap[ped] about 'real-life events,' including 'real-life individuals who have been murdered' " and "casually describe[d] graphic, widespread violence." (*Id.* at pp. 961, 965, 970.) The court noted that some gang evidence was admissible, as the People's theory of motive was premised on the defendant's gang membership. (*Id.* at p. 963.) But it found the videos highly prejudicial and cumulative of other evidence, including "more than a dozen screenshots from the videos depicting [the defendant] associating with other Taliban members and making Taliban hand signs." (*Id.* at pp. 966, 968.) "In fact," the court went on, "the only new 'information' provided by the videos is the lyrics, and the lyrics are the problem." (*Id.* at p. 968.) The case before us, however, is not comparable. Defendant, to start, never even claims the screenshots were cumulative of other evidence. And the trial court here, if anything, followed the very approach the *Coneal* court appeared to favor—it excluded the video itself and admitted the screenshots.

12

Lastly on the topic of undue prejudice, defendant argues *Flores* and similar cases are distinguishable because the defendants in those cases were gang members. (See, e.g., *Flores, supra*, 9 Cal.5th at p. 379; *People v. McKinnon, supra*, 52 Cal.4th at p. 655.) In contrast here, defendant points out, a stipulation stated that "[h]e is not an active member of any criminal street gang." We agree this stipulation is important. On the one hand, it lessened the potential prejudicial effect of the screenshots, eliminating the risk that the jury would speculate that defendant was a gang member. But on the other hand, it arguably lessened the relevance of the gang evidence. Although gang evidence could help explain why a gang member would act against a perceived gang rival, it generally does less to explain the conduct of non-gang members. Still, we find the gang evidence relevant here. While the stipulation established that defendant was not an active member of the Crips (or any other gang), the evidence still tended to establish that defendant supported the Crips. On this record, we find the video screenshots remained highly relevant on the topic of motive, even if they would have been more relevant still had defendant been a gang member. (See *People v. Montes, supra*, 58 Cal.4th at p. 859 [finding gang evidence admissible in a murder trial even though the evidence suggested the defendant was not yet a gang member at the time of the murder].)

## III

### *Section 352.2*

Finally, we consider defendant's contention that a recently enacted statute, section 352.2, applies retroactively and requires reversal in this case.

Section 352.2 became effective on January 1, 2023, several months after the trial in this case. It provides: "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that

13

expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (§ 352.2, subd. (a).) The statute adds that the court must consider additional matters in certain circumstances and defines "creative expression" to mean "the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media." (*Id.*, subds. (b)-(c).)

The legislative findings in the bill enacting section 352.2 explain the basis for these new requirements. The Legislature declared: "Existing precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings. In particular, a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence." (Stats. 2022, ch. 973, § 1, subd. (a).) With section 352.2, the Legislature intended "to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1, subd. (b).)

Citing this new law, defendant argues reversal is required here because section 352.2 applies retroactively, and the trial court prejudicially failed to comply with it. He

14

reasons that the statute applies retroactively under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) because it provides a possible ameliorative benefit to some defendants.  Two published Court of Appeal cases have already considered this very issue, with different results.  One court found the statute applies retroactively in nonfinal cases (*People v. Venable* (2023) 88 Cal.App.5th 445, 448, review granted May 17, 2023, S279081 (*Venable*))—which it to say, it applies retroactively "until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed" (*People v. Nasalga* (1996) 12 Cal.4th 784, 790, fn. 5).  Another court found differently, finding the statute does not apply retroactively.  (*People v. Ramos* (2023) 90 Cal.App.5th 578, 595, review granted July 12, 2023, S280073.)  We agree with the latter court.

Penal Code section 3 provides that "[n]o part of [the Penal Code] is retroactive, unless expressly so declared."  But "[e]ven without an express declaration," case precedent holds that "a statute may apply retroactively if there is ' "a clear and compelling implication" ' that the Legislature intended such a result."  (*People v. Alford* (2007) 42 Cal.4th 749, 754.)  *Estrada* is one such precedent.  A new statute there reduced the punishment for an offense after the defendant committed the offense, and it included no express statement on whether the reduced penalty should apply retroactively.  (*Estrada, supra*, 63 Cal.2d at p. 742.)  Although our Supreme Court had previously held that defendants in these circumstances should be punished under the law in effect when the offense was committed, the court overruled that approach in *Estrada*.  (*Ibid.*)  It reasoned that the Legislature "must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply," "because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance."  (*Id.* at p. 745.)

Our Supreme Court has since explained that " '[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible,

15

distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 (*Lara*).) On this principle, the court has applied *Estrada* to statutes that it has found " 'analogous' to the *Estrada* situation" (*id.* at p. 312), including (1) statutes altering the punishment (and certain legal consequences) for an offense (*People v. Prudholme* (2023) 14 Cal.5th 961, 968-969 [statute reducing probation term, though "probation is not considered a traditional form of punishment"]), (2) statutes that "by design and function" reduce the possible punishment for an offense (*People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*); see *Lara,* at p. 303 [statute authorizing trial courts to treat an offender as a juvenile rather than adult, which "can result in dramatically different and more lenient treatment"]), and (3) statutes governing substantive offenses and penalty enhancements (*Frahs,* at p. 628; *People v. Wright* (2006) 40 Cal.4th 81, 94-95 [statute adding an affirmative defense]).

Section 352.2, however, is not " 'analogous' to the *Estrada* situation." (*Lara, supra*, 4 Cal.5th at p. 312.) It does not alter the punishment or other consequences for an offense. It does not, by design or function, reduce the possible punishment for an offense. It does not change the substantive offense or penalty enhancement for any crime. And it is not a statute that, if applied prospectively only, could be said to reflect the Legislature's "desire for vengeance." (*Estrada, supra*, 63 Cal.2d at p. 745.) It is instead a new evidentiary rule intended to prevent trial courts from admitting a person's creative expression without first properly evaluating the negative consequences of doing so. And it is a neutral rule at that, limiting a defendant's ability to present a person's creative expression just as much as the prosecution's ability to present this type of evidence. To be sure, we expect the statute will tend to affect the prosecution's ability to present evidence more than a defendant's ability. And in some cases, no doubt, defendants will benefit from having adverse evidence excluded under section 352.2. But in other cases, the prosecution will instead be the beneficiary, as could be true, for instance, if a defendant attempted to falsely accuse another of a crime based on that

16

person's poetry, rap lyrics, or other creative expression. Neutral evidentiary rules of this sort do not warrant *Estrada* treatment. (See *People v. Ramos, supra*, 90 Cal.App.5th at p. 595, review granted [finding § 352.2 different in kind from previous statutes found retroactive under the *Estrada* rule]; *People v. Cervantes* (2020) 55 Cal.App.5th 927, 937, 940-941 [rule requiring the recording of custodial interrogations of those suspected of committing murder—which would at times benefit defendants and at other times benefit prosecutors—did not apply retroactively].)

Our Supreme Court's precedents demonstrate as much. In *People v. Hayes* (1989) 49 Cal.3d 1260, for instance, the court considered the retroactive effect of a statute governing the admissibility of certain hypnosis-induced testimony. The statute provided that a witness's testimony "is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness' testimony, if [certain conditions] are met." (*Id.* at p. 1273, fn. 4.) Although retroactive application of the statute certainly could have benefitted some defendants, including those whose trials involved adverse testimony that would be excluded under the new statute, the court declined to find it applied retroactively. It noted that "[a] new statute is generally presumed to operate prospectively absent an express declaration of retroactivity or a clear and compelling implication that the Legislature intended otherwise." (*Id.* at p. 1273.) It then explained that it could find nothing overcoming this presumption, noting the statute included no retroactivity clause and that "[n]othing in the history, context, wording or purpose of the legislation suggests that the Legislature intended the new provisions to apply retroactively." (*Ibid.*)

The court's decision in *People v. Robertson* (1989) 48 Cal.3d 18 is similar. The court there considered which of two laws applied in a capital trial—a 1977 death penalty law (which was in effect at the time of the offense) or a 1978 death penalty law (which was in effect at the time of trial). The 1978 law favored the defendant in part because,

17

under its terms, "the prosecution's case for aggravation is limited to evidence relevant to [certain] listed factors," while under the 1977 law, the prosecution could present evidence " 'relevant to aggravation, mitigation, and sentence' [citation], even if it did not relate to any specific aggravating or mitigating factor." (*Id.* at p. 51.) Considering these differences, the trial court "expressed its intent to apply any provisions of the 1978 law it deemed more favorable than the 1977 law—in effect, to give defendant the 'best of both worlds.' " (*Ibid.*) But our Supreme Court found this approach "gave defendant more than he was entitled to" and found inapposite cases that had applied *Estrada*'s presumption of retroactivity. It reasoned that "[t]he replacement of the 1977 death penalty law with the 1978 law had no bearing on the criminality of defendant's conduct or the severity of punishment therefor; hence the statute in effect at the time of the offenses governs." (*Ibid.*)

One last example from our Supreme Court is *Tapia v. Superior Court* (1991) 53 Cal.3d 282. The court there considered whether Proposition 115, the "Crime Victims Justice Reform Act," applied retroactively. Proposition 115, among other things, made hearsay evidence admissible at preliminary hearings, required felony trials to take place within 60 days of arraignment, and added an intent requirement for certain special circumstances for murder. (*Tapia,* at pp. 299, 301.) Addressing the retroactive application of the law, the court wrote: "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Id.* at p. 287.) It then, after noting that "the text of Proposition 115 and the related ballot arguments are entirely silent on the question of retrospectivity," concluded that "as to most of Proposition 115's provisions we see no reason to depart from the ordinary rule of construction that new statutes are intended to operate prospectively." (*Ibid.*) The court noted an exception only for the proposition provisions that "clearly benefit[ted] *only* defendants"—which were the portions adding an intent requirement for certain special

18

circumstances—even though other provisions—including those concerning hearsay evidence in preliminary hearings and the time for bringing felony cases to trial—could certainly benefit some defendants (along with some prosecutors). (*Id.* at pp. 300-301, italics added; see *id.* at p. 287, fn. 3.)

Adopting defendant's favored construction of *Estrada* would be inconsistent with this precedent. It would also make *Estrada*'s presumption of retroactivity the exception that swallows the rule in Penal Code section 3, with all new rules presumptively retroactive so long as they might benefit a defendant. We decline to endorse this approach. (See *People v. Robertson, supra*, 48 Cal.3d at p. 51 [not all laws that are potentially beneficial to a defendant apply retroactively]; see also *People v. Brown* (2012) 54 Cal.4th 314, 324 [emphasizing that *Estrada* plays a "limited role . . . in our jurisprudence of prospective versus retrospective operation"]; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1209 ["The language in *Estrada* . . . should not be interpreted as modifying this well-established, legislatively mandated principle" concerning retroactivity].) Finding no clear indication of the Legislature's intent on the topic of retroactivity—apart from its general instruction that "[n]o part of [the Penal Code] is retroactive, unless expressly so declared" (Pen. Code, § 3)—we conclude that section 352.2 does not apply retroactively.

Although, as noted, the Court of Appeal in *Venable* reached a different conclusion, we find its reasoning misplaced. The court there found section 352.2 applies retroactively largely based on our Supreme Court's decisions in *Lara* and *Frahs*. (*Venable, supra*, 88 Cal.App.5th at pp. 456-457, review granted.) These cases, it is true, include some language arguably supportive of this finding. *Lara*, for example, explained that the court had applied the *Estrada* rule "to a statute that merely made a reduced punishment possible," citing a case—*People v. Francis* (1969) 71 Cal.2d 66—involving a law granting trial courts discretion to treat marijuana possession, formerly "a straight felony," as either a felony or a misdemeanor. (*Lara, supra*, 4 Cal.5th at pp. 307, 303.)

19

*Frahs* afterward said the very same.  (*Frahs, supra*, 9 Cal.5th at p. 629.)  Both *Lara* and *Frahs*, moreover, found *Estrada* applied to the laws considered in those cases, which the court described as laws providing "a possible ameliorating benefit for a class of persons." (*Frahs*, at p. 624; see *Lara*, at p. 308.)  Considered alone, these statements might be read to suggest that section 352.2 should apply retroactively.  After all, for some defendants, the application of the statute could result in the exclusion of certain adverse evidence, which could consequently limit the persuasive force of the prosecution's argument and thus "ma[k]e a reduced punishment possible."  (*Lara*, at p. 303.)  So went the reasoning in *Venable*.  (*Venable*, at pp. 456-458.)

But in our view, that is not the appropriate takeaway from *Lara* and *Frahs*. Context for these cases is important.  *Frahs* involved a law creating a diversion program for certain defendants with mental health disorders and requiring trial courts to dismiss charges for those who successfully participate in this program.  (*Frahs, supra*, 9 Cal.5th at pp. 624, 631.)  In enacting this law, the Legislature expressly aimed to " '[i]ncrease[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system."  (*Id.* at p. 631.)  *Lara*, in turn, involved a law prohibiting prosecutors from charging juveniles with crimes directly in adult (i.e., criminal) court, allowing them to move to adult court for certain crimes only if a juvenile court first agreed that adult court was appropriate.  (*Lara, supra*, 4 Cal.5th at p. 305.) The *Lara* court explained that the law—which was expressly intended "to '[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles' " (*id.* at p. 309)—"can result in dramatically different and more lenient treatment" (*id.* at p. 303). That is because of the different purposes of juvenile court where the emphasis is on rehabilitation (*ibid.*) and adult court where the emphasis is in part on punishment (Pen. Code, § 1170, subd. (a); see also *Lara*, at p. 308 [" 'the impact of the decision to prosecute a minor in criminal court rather than juvenile court can spell the difference between a 16-year-old minor . . . being sentenced to prison for 72 years to life, or a

20

discharge from the [Division of Juvenile Justice's] custody at a maximum of 23 years of age' "]).

Both *Lara* and *Frahs*, then, concerned laws that "by design and function" reduce the possible punishment for a class of persons (*Frahs, supra*, 9 Cal.5th at p. 624), with one giving certain defendants an opportunity to participate in a program that could result in the dismissal of all charges (*Frahs*) and the other giving certain juveniles a better shot at remaining in juvenile court and avoiding the harsher penalties of adult court (*Lara*). Both, moreover, concerned laws that provide only a possible benefit to a class of persons, not laws that, depending on the facts, could either be beneficial or detrimental. Our Supreme Court ultimately found these laws " 'analogous' to the *Estrada* situation" (*Lara, supra*, 4 Cal.5th at p. 312) and "within the spirit of the *Estrada* rule" (*Frahs,* at p. 631). But in doing so, neither *Lara* nor *Frahs* purported to expand *Estrada*'s scope to cover all laws that might provide an ameliorative benefit to a defendant. Nor did either purport to overrule the court's prior decisions in *Hayes*, *Robertson*, and *Tapia*—all of which demonstrate that a law is not retroactive simply because it might provide an ameliorative benefit to a defendant and might even (broadly speaking) result in a reduced punishment.

With this context in mind, we return to the relevant question: Is section 352.2 " 'analogous' to the *Estrada* situation"? (*Lara, supra*, 4 Cal.5th at p. 312.) We conclude that it is not. Nor do we find it comparable to the laws considered in *Lara* and *Frahs*. Unlike the laws in those cases, section 352.2 is not a law that by design and function reduces the possible punishment for an offense. Nor is it a law that is even targeted to benefit defendants specifically. It is instead a neutral evidentiary rule providing its benefits to all comers, potentially to the detriment of defendants. That, in our view, is not the type of law that triggers the *Estrada* rule.[2]

---

[2] The *Venable* court also believed its conclusion consistent with a recent Court of Appeal decision finding the *Estrada* rule applied for a new law that "allows the defense to

21

DISPOSITION

The judgment is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
DUARTE, Acting P. J.

_____/s/_____
KRAUSE, J.

---

request a bifurcated trial on gang enhancements." (*People v. Burgos* (2022) 77 Cal.App.5th 550, 561, review granted July 13, 2022, S274743.)  The retroactivity of that law "is the subject of a split of authority among the Courts of Appeal." (*People v. Tran* (2022) 13 Cal.5th 1169, 1208.)  But we need not weigh in on this split here.  It is enough for our purposes that we find *Burgos* readily distinguishable, for it involves a new law that benefits defendants only.

22